**In the Interest of Christina Cociecae DE LA PENA, a minor child.**

No. 08–98–00211–CV.

Court of Appeals of Texas, El Paso.

July 29, 1999.

Nancy L. Hart, Midland, for Appellant.

Paul Williams, Midland, for State.

Before Panel No. 2 BARAJAS, C.J., McCLURE, and CHEW, JJ.

## OPINION

ANN CRAWFORD McCLURE, Justice.

In this child custody case, Elsa Doss appeals from an order appointing her brother, Caesar De la Pena, as a joint managing conservator of his daughter, Christina. Finding that Elsa failed to rebut the parental presumption, we affirm.

## FACTUAL SUMMARY

Christina was born November 19, 1991, to Sonia Rodrigues and Caesar De la Pena, who at the time was in prison for burglary. Christina lived with her paternal grandparents, her maternal grandparents, and an aunt until Caesar was released from prison, at which time Christina was approximately eighteen months old. Thereafter, Caesar and Christina lived with the child's maternal grandparents in San Jose, California.

In late 1993 or early 1994, Caesar and Sonia agreed that Elsa, Caesar's sister, would temporarily care for Christina and her older brother, Albert. In February 1994, Elsa and her lesbian partner, Tracie Wood, flew to California to pick up the children and returned with them to Midland. The children remained with Elsa and Tracie until August 1994, when Caesar traveled to Midland to pick up Albert. It was agreed at that time that Christina would remain with Elsa for another month at which point Sonia would pick her up. Sonia failed to do so. Finally, in November, Caesar indicated that he wanted to regain possession of Christina as well. Elsa made various excuses to postpone Caesar's trip to Midland, and in February 1995, Elsa filed suit for sole managing conservatorship of Christina.

On February 22, 1995, Elsa, Sonia, and Caesar appeared for a hearing on temporary conservatorship. Elsa and Sonia were appointed temporary joint managing conservators, with Elsa having the right of primary possession. Caesar was appointed temporary possessory conservator and both he and Sonia were granted restricted visitation with Christina.

In April 1996, Caesar was allowed an unsupervised weekend visit with Christina. After returning the child to Elsa, Caesar filed child abuse charges against Tracie. Both Child Protective Services and the Midland Police Department investigated the allegations and dismissed the charges

as unfounded. At another hearing the following month, Caesar was granted an additional weekend visit per month. Sonia failed to appear at that hearing and she has had no further contact with Christina. Caesar continued to call his daughter and visited her twice between April 1996 and September 1997.

Following a final hearing on September 12, 1997, the trial court appointed Elsa and Caesar joint managing conservators of Christina with Caesar having the right to determine Christina's primary residence. In two issues for review, Elsa challenges the trial court's decision to deny her request for sole managing conservatorship, and in the alternative, she complains of the court's designation of Caesar as the child's primary caretaker in a joint managing conservatorship.

### STANDARD OF REVIEW

Our consideration of this appeal requires the application of overlapping relevant standards of review.

#### *Traditional Sufficiency Review*

■ A "no evidence" or legal insufficiency point is a question of law which challenges the legal sufficiency of the evidence to support a particular fact-finding. There are basically two separate "no evidence" claims. Where, as here, the party having the burden of proof suffers an unfavorable finding, the point of error challenging the legal sufficiency of the evidence should be that the fact or issue was established as "a matter of law." When the party without the burden of proof suffers an unfavorable finding, the challenge on appeal is one of "no evidence to support the finding." *See Creative Manufacturing, Inc. v. Unik*, 726 S.W.2d 207, 210 (Tex.App.—Fort Worth 1987, writ ref'd n.r.e.). The standard of review requires a determination by the appellate court as to whether, considering only the evidence and inferences that support a factual finding in favor of the party having the burden of proof in a light most favorable to such

findings and disregarding all evidence and inferences to the contrary, there is any probative evidence which supports the finding. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965); *Southwest Craft Center v. Heilner*, 670 S.W.2d 651, 653 (Tex.App.— San Antonio 1984, writ ref'd n.r.e.); *Terminix International, Inc. v. Lucci*, 670 S.W.2d 657, 662 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.); *Dayton Hudson Corp. v. Altus*, 715 S.W.2d 670, 672 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). If more than a scintilla of evidence supports the finding, the "no evidence" point fails. *Tseo v. Midland Am. Bank*, 893 S.W.2d 23, 25 (Tex.App.—El Paso 1994, writ denied); *Hallmark v. Hand*, 885 S.W.2d 471, 474 (Tex.App.—El Paso 1994, writ denied).

■ "Insufficient evidence" or factual insufficiency involves a finding that is so against the great weight and preponderance of the evidence as to be manifestly wrong. Where, as here, the party having the burden of proof complains of an unfavorable finding, the point of error should allege that the findings "are against the great weight and preponderance of the evidence." The "insufficient evidence" point of error is appropriate only when the party without the burden of proof on an issue complains of the court's findings. *Neily v. Aaron*, 724 S.W.2d 908, 912 (Tex. App.—Fort Worth 1987, no writ).

■ The test for factual insufficiency is set forth in *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). In reviewing a point of error asserting that a finding is against the great weight and preponderance of the evidence, we must consider all of the evidence, both the evidence which tends to prove the existence of a vital fact as well as evidence which tends to disprove its existence. It is for the fact finder to determine the weight to be given to the testimony and to resolve any conflicts in the evidence. *Carrasco v. Goatcher*, 623 S.W.2d 769, 772 (Tex.App.— El Paso 1981, no writ). The finding should

be sustained if there is some probative evidence to support it and provided it is not against the great weight and preponderance of the evidence. *Id.* The parlance used by the courts of appeals is that such a finding "shocks the conscience" or that it is "manifestly unjust," limited by such phrases as "the jury's determination is usually regarded as conclusive when the evidence is conflicting," "we cannot substitute our conclusions for those of the jury," and "it is the province of the jury to pass on the weight or credibility of a witness's testimony." *See e.g., Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 30 (Tex.1994); *Beall v. Ditmore,* 867 S.W.2d 791, 795 (Tex.App.—El Paso 1993, writ denied). Thus, we cannot substitute our judgment for that of the fact finder even if we find a fact contrary to that found by the jury, provided the jury finding is supported by probative evidence and is not against the great weight and preponderance of the evidence. If, however, the verdict is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained. In a bench trial, the findings of fact made by the trial judge are the equivalent of a jury answer in the charge and subject to the same scrutiny on appeal. *Lindsey v. Lindsey,* 965 S.W.2d 589, 591 (Tex.App.— El Paso 1998, no pet.).

### *Abuse of Discretion Standard*

▉▉▉ We review the trial court's determination of conservatorship under an abuse of discretion standard. *Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex.1982); *Doyle v. Doyle,* 955 S.W.2d 478, 479 (Tex. App.—Austin 1997, no writ); *MacCallum v. MacCallum,* 801 S.W.2d 579, 582 (Tex. App.—Corpus Christi 1990, writ denied). A trial court abuses its discretion when it acts in an arbitrary and unreasonable manner, or when it acts without reference to any guiding principles. *Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex.1991); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex. 1985); *Doyle,* 955 S.W.2d at 479. The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate justice in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Downer,* 701 S.W.2d at 242; *In the Interest of A.D.H.,* 979 S.W.2d 445, 447 (Tex.App.—Beaumont 1998, no writ). "[T]he trial court is in the best position to observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record." *A.D.H.,* 979 S.W.2d at 447, *quoting Warchol v. Warchol,* 853 S.W.2d 165, 168 (Tex. App.—Beaumont 1993, no writ). Consequently, an abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence. *A.D.H.,* 979 S.W.2d at 447; *Valdez v. Valdez,* 930 S.W.2d 725, 731 (Tex.App.—Houston [1st Dist.] 1996, no writ). Furthermore, an abuse of discretion does not occur as long as some evidence of a substantive and probative character exists to support the trial court's decision. *Id.*

▉▉▉ An appeal directed toward demonstrating an abuse of discretion is one of the tougher appellate propositions. Most of the appealable issues in a family law case are evaluated against an abuse of discretion standard, be it the issue of property division incident to divorce or partition, conservatorship, visitation, or child support. In some instances, the abuse of discretion standard overlaps the traditional sufficiency review. Several courts have concluded that when the trial court's ruling on the merits is reviewed under an abuse of discretion standard, the normal sufficiency of the evidence review is part of the abuse of discretion review and not an independent ground for reversal. *Crawford v. Hope,* 898 S.W.2d 937, 940–41 (Tex.App.— Amarillo 1995, writ denied)(when standard of review is abuse of discretion, factual and legal sufficiency are not independent grounds of error); *accord, Thomas v. Thomas,* 895 S.W.2d 895, 898 (Tex.App.— Waco 1995, writ denied); *In the Matter of*

the Marriage of Driver, 895 S.W.2d 875, 877 (Tex.App.—Texarkana 1995, no writ); Wood v. O'Donnell, 894 S.W.2d 555, 556 (Tex.App.—Fort Worth 1995, no writ); In the Interest of Pecht, 874 S.W.2d 797, 800 (Tex.App.—Texarkana 1994, no writ); but see Matthiessen v. Schaefer, 897 S.W.2d 825, 828 (Tex.App.—San Antonio 1994)(Duncan, J., dissenting)(appellate court should review award of attorney's fees by normal sufficiency of evidence standard, and not subsume sufficiency of evidence into abuse of discretion standard), rev'd on other grounds, 915 S.W.2d 479 (Tex.1995).

■ We have previously agreed with Justice Duncan's dissenting opinion in Matthiessen. In Lindsey, 965 S.W.2d at 589, we addressed the conflict between the traditional sufficiency review and the abuse of discretion standard in the context of a child support modification and determined that once it has been determined that the abuse of discretion standard applies, an appellate court should engage in a two-pronged inquiry: (1) Did the trial court have sufficient information upon which to exercise its discretion; and (2) did the trial court err in its application of discretion? Lindsey, 965 S.W.2d at 592. The traditional sufficiency review comes into play with regard to the first question; however, our inquiry cannot end there. Id. We must proceed to determine whether, based on the elicited evidence, the trial court made a reasonable decision. Id. Stated inversely, we must conclude that the trial court's decision was neither arbitrary nor unreasonable. Id.

### APPLICABLE PARENTAL PRESUMPTION

■ There is a strong presumption that the best interest of a child is served if a natural parent is appointed as a managing conservator. A.D.H., 979 S.W.2d at 447; see also Brook v. Brook, 881 S.W.2d

297, 299 (Tex.1994); TEX.FAM.CODE ANN. § 153.131(a)(Vernon 1996).[1] Section 153.131(a) statutorily provides for the appointment of the parent as sole managing conservator, or the parents as joint managing conservators, unless the court finds the appointment would not be in the best interest of the child because it would significantly impair the child's physical health or emotional development. The parental presumption is rebuttable under Section 153.373(1) if the parent has voluntarily relinquished actual care, control, and possession of the child for a period of one year or more.

■ Elsa initially argues that since Caesar voluntarily relinquished possession of Christina for a period of one year, she has rebutted the presumption that he should be appointed as a managing conservator. We disagree. The testimony reveals that Caesar attempted to regain possession of Christina in November, approximately nine months after Elsa took the child to Midland. Over the next three months, Elsa continually offered excuses why Caesar could not retrieve his daughter. Elsa candidly admitted that she made the series of excuses to keep Caesar away because she wanted to maintain possession of Christina for the statutory one year period. Therefore, we cannot find that Caesar voluntarily relinquished control of Christina for the requisite period of time. Accordingly, the parental presumption applies.

### IS THE PRESUMPTION REBUTTED?

■ For the court to award managing conservatorship to a nonparent under Section 153.131, the nonparent must prove by a preponderance of credible evidence that appointing the parent as a managing conservator would result in serious physical or emotional harm to the child. In the Interest of M.W., 959 S.W.2d 661, 665

---

**1.** All statutory references herein are to the Texas Family Code unless otherwise indicat- ed.

(Tex.App.—Tyler 1997, no writ); *Brook,* 881 S.W.2d at 298. There must be evidence to support the logical inference that some specific, identifiable behavior or conduct of the parent will probably cause that harm. *M.W.,* 959 S.W.2d at 665. This link between the parent's conduct and harm to the child may not be based on evidence which merely raises a surmise or speculation of possible harm. *Id.* When a nonparent and a parent are both seeking managing conservatorship, "close calls" go to the parent. *M.W.,* 959 S.W.2d at 666; *Ray v. Burns,* 832 S.W.2d 431, 434 (Tex. App.—Waco 1992, no writ).

Developing case law has indicated certain acts or omissions which would demonstrate significant impairment of the child, such as physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior on the part of the parent. *M.W.,* 959 S.W.2d at 666; *Thomas v. Thomas,* 852 S.W.2d 31, 35–36 (Tex. App.—Waco 1993, no writ). While we are to determine the present fitness of a parent, we recognize that an adult's future conduct may be somewhat determined by recent past conduct. *M.W.,* 959 S.W.2d at 666. In and of itself, however, evidence of past misconduct may not be sufficient to show present unfitness. *Id.* Further, it is wholly inadequate to simply present evidence that a nonparent would be a better choice as custodian of the child. *Id.*

In *Lewelling v. Lewelling,* 796 S.W.2d 164, 167 (Tex.1990), the Supreme Court addressed a custody dispute between the mother and the paternal grandparents. The evidence revealed:

- on-going physical abuse of the mother by the father, including abuse during the mother's pregnancy, of which the grandparents had knowledge;
- the mother had repeatedly reconciled with the father despite the abuse and acknowledged that if he received counseling, she would consider returning to the marriage;
- the child had resided most of his life with the grandparents;

- the mother did not see the child for nearly a two-month period while the child was living with the grandparents;
- a recommendation by a social worker that the child be placed with the grandparents;
- the mother was unemployed and had limited economic resources;
- the mother had twice been a patient at Terrell State Hospital; and
- the mother lived in crowded conditions with her mother, her sister, and her mentally retarded nephew.

*Id.* at 165–67. The Court concluded that even these aggregated facts constituted no evidence that granting managing conservatorship to the mother would significantly impair the child's physical health or emotional development, holding that the statute requires the nonparent "to offer evidence of specific actions or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child." *Id.* at 167.

The San Antonio Court of Appeals has struggled with the causal connection standard enunciated in *Lewelling* and interpreted the ruling to include not only direct evidence of the link between parental conduct and impairment to the child but also the logical inferences that flow therefrom:

When the court's requirement of a causal connection between acts or omissions of the parent and significant impairment to the child is considered in context, we believe it is apparent that the court did not intend to supplant the legislatively-mandated standard set forth in section 153.131. Rather, the court clarified that there must be either direct evidence that placement of the child with the parent would significantly impair the child's physical health or emotional development or direct evidence from which a factfinder [sic] could reasonably (or perhaps even necessarily) reach that conclusion.

*In the Interest of Rodriguez*, 940 S.W.2d 265, 272 (Tex.App.—San Antonio 1997, writ denied). The Court then commented that the trial court may not infer significant impairment from direct evidence that the mother had been an abused spouse, unemployed, living in crowded conditions, or committed to a mental institution on a short-term basis. Nor could the court infer significant impairment when the evidence merely shows that a nonparent might be a better custodian or that placement of the child with a parent might constitute a potential threat to the child's physical health or emotional development. *Id.* at 273. Applying those guidelines to the facts before them, the Court affirmed the appointment of the nonparent as the managing conservator of the child where the evidence revealed:

- the child had resided with the nonparents since the day after her birth and had visited with her father only twice since her birth;
- the child experienced serious sleep disorders and regressive behavior following the two visits with her father;
- the child had bonded with the nonparents other daughter, whom she considered her little sister;
- expert witnesses testified that removing the child from the nonparents' home would be "devastating," "very traumatic," and likened it to "psychological amputation;"
- the father had scheduled a visit and failed to show up;
- it was the paternal grandmother and not the father who telephoned the nonparents, bought, wrapped, and addressed the cards and presents sent to the child; and
- the father failed to return the telephone calls of the nonparents.

In short, *Rodriguez* suggests significant impairment of emotional development may be inferred from uprooting a child or from placement with a parent who has a poor track record for stability and continuity.

Custody disputes by their very nature are inherently fact-intensive. Concepts of psychological parenting,[2] bonding, and the depth of attachments to parent-figures must be viewed in the context of the evidence presented. Appellate courts routinely defer to the fact finder at trial concerning matters of credibility and demeanor, but perhaps in no other type of litigation is it more critical. In most instances, the fact finder will not hear from the child the subject of the suit. The child's behavior, experiences, fears, joys, and significant attachments will be conveyed through pictures and through the words of other witnesses, both lay and expert. The individuals vying for conservatorship may be scrutinized by the fact finder for such intangible signs as an animated smile when describing a child's achievements, a furrowed brow when explaining typical affectionate concern, or even tears when anticipating the emotional impact the outcome of litigation will have on a child. We agree that specific acts or omissions of a parent implicating a significant impairment to a child's emotional development may be inferred from direct evidence. We also agree that because safety, security, and stability are critical to child development, the danger of uprooting a child may in some instances rise to a level that significantly impairs the child's emotional development. Once again, however, such a conclusion depends on the facts of the case.

There is no dispute that Elsa and Tracie have provided a caring and nurturing home for Christina. However, in order for Elsa to gain custody of Christina, she must show more. As a nonparent, she must demonstrate that returning Christina to Caesar would result in serious physical or

---

**2.** Psychological parenting is explained by mental health professionals in a number of ways, such as "the ability to kiss it and make it well." ("If a child falls and bumps her head, to which parent-figure will she run for comfort?")

emotional harm to the child. We turn now to the evidence elicited at trial.

### The Counselor

Joan Pace, Christina's counselor, testified that Christina is a happy, well-mannered, energetic, people-oriented child who is self-confident and well-adjusted. She explained the common elements of child development and that the three ingredients necessary for a child's emotional and psychological health are trust, stability, and security. In her experience, it would be damaging to a child to disrupt any of the three elements and the effect would be manifested in disruptive behavior. In her thirteen visits with Christina, she had come to the conclusion that the child was attached to Elsa and Tracie, but had not formed any attachment to her father, did not miss him when he was not around, and suffered no separation anxiety. She predicted that it would be harmful to the child to remove her from the only adult mothers[3] she has ever known because she would not understand why they were taken away from her. She believed that it would be in the child's best interest to remain with Elsa and Tracie.

Moreover, Pace believed Christina was somewhat stressed because of the allegations of child abuse Caesar had lodged against Tracie.

Q: What was it about that contact with her that led you to conclude that she was distressed by her father's conduct?

A: I had asked her what the most fun thing she had done recently, and she told me playing with Emily at school. Then she went on to tell me that she played with Albert, her brother, and then she spontaneously said that Caesar told me 'I'll call the cops if your mamma and mommy aren't good.' And Christina said to me 'I don't know why he said that,

but I don't want him to.' I told him he had better not call the cops and if you say that one more time I'm going to call the cops on you.

. . .

Q: What is [sic] about those statements that led you to conclude that this child was under some stress?

A: I think the statement about 'I don't understand why he said that,' to me is indicative of stress. When a child [sic] sense of trust and security and safety has been violated, one of the things that happens is they feel confused and maybe torn between, you know, who do I believe, what is happening in my world. Also, I consider this statement significant because my notes do not show, nor do I recall at any other time Christina spontaneously mentioning her father.

. . .

Q: Do you think it is harmful for Christina to have someone in a position of authority, like a father, making statements of that nature about her family, her primary caretaker?

A: Yes, I do.

Q: And in your mind, and based upon your experience and your education, is there any significance to the fact that this kind of conduct occurred twice, on two occasions, back occasions, that Mr. De la Pena had contact with this child?

A: Yes, my concern is that the two visits he had, which were approximately six months apart, were the first two visits that he had had with Christina in a fairly long time, and her responses indicate that Mr. De la Pena had an agenda of his own, which was not in Christina's best interest.[4]

---

**3.** Pace testified that Christina refers to Elsa and Tracie as "mamma" and "mommy."

**4.** Elsewhere in her testimony, Pace characterized Caesar's conduct during these two visits

...

Q: And your consider [sic] then, as I understand it, that given the opportunity, based upon his past conduct, Mr. De la Pena will engage in behavior that is likely to cause her real harm?

A: Yes, my consider [sic] is that I believe we are dealing with a healthy, well adjusted child and I have real concern that a different agenda, whether that is a custody fight, or perhaps anger about an outcome of a custody fight, would surface in ways that Christina's best interest would not be the top priority.

Thus, the thrust of Pace's analysis concerning the best interest of the child was that Christina was thriving in her present environment and that to separate her from Elsa and Tracie would be "breaking something that is fixed." We also note that all of the information Pace had concerning Caesar was reported to her from Elsa and Tracie; she admittedly knew nothing about his current circumstances or the environment he provided for Albert and would provide for Christina in California. Lastly, Pace addressed the homosexual relationship between Elsa and Tracie and opined that it would not harm Christina and that the child had not been affected in any way by their relationship.

### Elsa

Elsa testified Caesar had originally asked that she care for Christina because he was worried about her. At the time, the child "was being taken care of by a couple of aunts and the grandparents and they had a couple of jobs and so there [sic] schedule conflicted with Christina's sleep." Because she and Tracie have been together since January 1991, Elsa maintained that Caesar knew of their relationship at the time he sent Christina to live with them.

When Caesar indicated that he intended to come for Christina, Elsa became concerned about Sonia having access to the child because of her drug usage. Elsa recounted that when Caesar returned with Albert to California, Sonia had shown up at the grandparents' home and announced, "This is my son and I'm taking him." Worried about how Christina would be cared for and the limited contact Caesar had had with Christina, Elsa did not believe that it would be good for the child to be removed from the home in which she felt safe and secure. As for specific allegations of harm to Christina, Elsa questioned Caesar's conduct in initiating an investigation concerning suspected child abuse. Because the charges were filed during Caesar's first unsupervised visitation with Christina under the temporary orders, Elsa became concerned about her brother's motivation. She also believed that it was in Christina's best interest to remain with her because of Caesar's past criminal history. She speculated that perhaps he had not "turned around" because he was driving a Porsche and she questioned his ability to afford the car.

Lastly, Elsa related that her stepfather was a child molester who had abused both Caesar and Elsa during their childhood. She contended that Caesar stayed with this individual, who is still married to Caesar's and Elsa's mother, when he came to Midland to visit Christina. On cross-examination, Elsa admitted that during recent visits, Caesar had stayed in a Midland motel.

### Caesar

Caesar testified that he lives in San Jose, California with his fiancee and Albert. At the time of trial, Albert was in third grade and doing "exceptionally well." Caesar's fiancee is a school teacher. He has lived in the same home for approxi-

as demonstrating "a need to win a custody fight, rather than the need to behave in

Christina's best interest."

mately three years and attends a local church. He has worked for the City of San Jose since September of 1993 and has been promoted throughout the course of his employment.

At the time he asked Elsa to care for his children, Caesar did not have a job. He claimed that he did not know of Elsa's homosexual relationship with Tracie. In August 1994, when he was released from parole and able to leave the State of California, he traveled to Texas to pick up Albert. At the time, Albert was five and due to begin kindergarten that fall. Sonia was to come for Christina a month later, but "she basically ... disappeared from the face of the earth." Caesar enrolled Albert in school and began to talk to his parents and Elsa about bringing Christina back to California. Originally, he planned to come for his daughter around her birthday in November, but this was delayed because Elsa had already planned a birthday party for the child. It was further delayed so that Christina was not moved around the Christmas holidays. Elsa then tried to stall him by telling him she planned to attend a wedding in Kansas. He expected to hear from Elsa when she returned from Kansas, and when she did not call, he flew to Midland only to learn that Elsa had filed this lawsuit.

Caesar explained the reasons he began the investigation into suspected child abuse. When he visited with Christina in April 1996, he noticed bruises on her legs and buttocks, and, because of his past incarceration, he "couldn't risk that ever coming back on me, stating that I had applied those bruises." He called the Midland Police Department and was asked to come in. Because he did not want to subject Christina to questioning, he photographed the bruises and went alone. He met with Detective Gilley, who told him that the bruises appeared to be normal for a child of her age. Caesar did not further pursue the allegations, noting:

At that point, like any parent, you are reacting to the physical evidence. I

wanted to find out the reason, and that's all I did, and I didn't proceed anymore after that. Like I stated, Detective Gilley gave me an explanation. The social services did too, and that's perfectly fine.

He also noted that his own victimization by his stepfather taught him "we cannot deny that it is a possibility; so I had to look into it." This experience also prompted him to only allow Christina to be around Caesar's stepfather on a supervised basis. Caesar responded to Pace's complaints that he had threatened to call the police on Elsa and Tracie by explaining that he had told Christina that if she needed help, not to be frightened but to call him or the police. Lastly, as for Elsa's complaints about his criminal past, Caesar specifically explained how he had financed the Porsche, a 1984 model, and that he was able to make the $210 payments from his salary.

### *Failure to Rebut the Presumption*

■ Because Elsa bore the burden to rebut the parental presumption, to prevail on her legal insufficiency complaint, she must establish *as a matter of law* that placement of Christina with Caesar would significantly impair the child's physical health or emotional development. Similarly, to prevail on her factual insufficiency complaint, she must establish that the great weight and preponderance of the evidence requires such a conclusion. We cannot so find when the evidence merely shows that Elsa might be a better custodian or that uprooting Christina might constitute a *potential* threat to her emotional development. *Lewelling,* 796 S.W.2d at 167; *Rodriguez,* 940 S.W.2d at 273.

The evidence before us is legally and factually sufficient to support the trial court's finding that while Caesar's past may not be stellar, it does not and should not preclude him from his parental role with Christina. While there was testimony that Pace was concerned that Caesar's primary motivation was a personal agenda to "win" custody rather than placing

Christina as his first priority and acting in her best interest, this conclusion was based upon Caesar's actions in investigating potential child abuse. The only other example given was Caesar's decision to spend the night with both children in the home of his stepfather, an individual both Caesar and Elsa described as a child molester. In both instances, Caesar offered explanations for his decisions and the steps he believed were necessary to protect Christina, all of which the trial court, as the fact finder, apparently accepted. While there is some evidence that uprooting a child could be harmful to a child's sense of security and ability to trust, there is no indication that any of Christina's visits with her father resulted in disruptive or uncharacteristic behavior or that she suffered any impairment other than some mild distress arising from a comment her father had made. Accordingly, there is no abuse of discretion in the trial court's failure to appoint Elsa as sole managing conservator. Elsa's first issue for review is overruled.

## PRIMARY POSSESSION

▉ We turn now to Elsa's contention that there is legally and factually insufficient evidence to support the trial court's implied finding that it is in Christina's best interest to award her father the right of primary possession pursuant a joint managing conservatorship. Section 153.372 of the Family Code authorizes the appointment of a parent and nonparent as joint managing conservators. Section 153.136 provides that if a joint managing conservatorship is ordered, the best interest of the child ordinarily requires the court to designate a primary physical residence for the child. Indeed, Section 153.002 requires that the best interest of the child shall always be the primary consideration in determining issues of conservatorship and possession.

Elsa suggests that the trial court focused solely upon Caesar and how his life situation had improved in recent years rather than upon Christina and whether she would be better off living with Caesar. She complains that the court in its findings of fact addressed only the testimony of the parties and not the other witnesses and that the court failed to address the fact that Caesar filed a report of child abuse "even though intentionally filing such reports is a crime and the fact that such a report has been filed and has been determined unfounded has been held by courts to be relevant in deciding conservatorship." Reluctantly, she concedes that Caesar denied doing so maliciously. She concludes that the trial court ignored uncontradicted expert testimony warning of the emotional hazards of abruptly uprooting the child and that as a result, it was unreasonable for the trial court to order that Christina move to California.

We turn for guidance to a recent Supreme Court decision authored by Justice O'Neill for a unanimous Court. *Beaber v. Beaber*, 42 Tex. Sup. Ct. J. 714, 995 S.W.2d 655 (1999). Although the case arises under the Texas version of the Uniform Child Custody Jurisdiction Act (UCCJA), the analysis applies equally here. At the time of their Texas divorce in 1991, the parents were appointed joint managing conservators of their child, with the mother granted "primary custody and control of the child" and the sole legal right to determine the child's residence. After the mother and child moved to Colorado in 1995, the decree was modified to address long-distance visitation. In 1997, the father instituted a modification proceeding in Texas, seeking primary possession and the right to establish the child's residence. Contending that Colorado was now the child's home state, the mother filed a plea to the jurisdiction which was granted by the trial court.

The intermediate appellate court reversed, concluding that the father's motion seeking primary possession was an action to litigate "possession of or access to the child," which was within the trial court's jurisdiction, rather than "custody," which

of course was not. *Beaber v. Beaber*, 971 S.W.2d 127, 129 (Tex.App.—Houston [14th Dist.] 1998):

> Thus, in modifying the right to establish the child's domicile, and like a modification in which parent has primary possession, the court would not be modifying the managing conservatorship because both parents retain their status as joint managing conservators of the child.

*Beaber v. Beaber*, 971 S.W.2d at 129.[5] The Supreme Court disagreed. The Court began by noting that the UCCJA defines "custody" as "managing conservatorship of a child." TEX.FAM.CODE ANN. § 152.002(2). In turn, "managing conservatorship" is defined as "the relationship between a child and a managing conservator appointed by court order." TEX.FAM.CODE ANN. § 101.019. The Court framed the issue thusly:

> Although a court may not exercise its continuing jurisdiction to modify 'custody' or 'managing conservatorship' if the child has acquired a new home state, it retains jurisdiction to modify visitation, which the Family Code defines as 'possession of or access to a child,' so long as at least one of the parties continues to reside in Texas.

> . . .

> Thus, if [the father's] motion seeks to modify custody or managing conservatorship, the trial court's dismissal was proper. On the other hand, if his motion merely concerns visitation, as the court of appeals concluded, the trial court abused its discretion in dismissing the motion.

*Beaber*, 42 Tex.Sup.Ct.J. at 715, 995 S.W.2d at 657. The Court faulted the intermediate court's analysis which likened the right of primary possession to visitation. Instead, the Court determined, "[A]lthough these rights necessarily encompass 'possession of or access to the child,' they are fundamentally 'rights inherent in a custody status.'" *Beaber*, 42 Tex.Sup.Ct.J. at 716, 995 S.W.2d at 658, *citing Leithold v. Plass*, 413 S.W.2d 698, 700 (Tex.1967). More importantly for our purposes here, the Court concluded that the father's motion to modify "sought to modify the types of rights that were core rights of managing conservatorship" and that the right of primary possession goes "far beyond what would ordinarily be considered visitation." *Id.* at 718, 995 S.W.2d at 660.

▪ If the right of primary possession is at the very core of managing conservatorship, it appears to us that the parental presumption must apply here as well. Section 153.372(b) provides that the procedural and substantive standards regarding a court-ordered joint managing conservatorship provided by Subchapter C of the Family Code apply to a nonparent joint managing conservator. The very first section of Subchapter C contains the parental presumption. *See* TEX.FAM.CODE ANN. § 153.131(a). Accordingly, we conclude that as between a parent and nonparent, unless the court finds that appointment of the parent would not be in the best interest of the child because it would significantly impair the child's physical health or emotional development, the parent shall be appointed sole managing conservator or the parent and nonparent shall be appointed joint managing conservators. If the

---

**5.** This holding has received considerable criticism from the family law bar. For example, one commentator has noted:

> Everyone I've talked to agrees that in a JMC [joint managing conservator] situation whoever has the right to determine domicile/primary residence of a child has 'custody' of that child and this is the intent and spirit of the [Family] Code when it emphasizes that in a JMC order one parent or the other must have the right to determine domicile/primary residence or the domicile primary residence of the child must be set forth by the parents or the [court] in the JMC order.... This opinion is wrong; places form over substance, encourages litigation, and creates a substantial impediment to child custody settlements.

D. Gray, *Interesting Cases*, State Bar of Texas ADVANCED FAMILY LAW COURSE (1998), at A–1.

court chooses the latter, the parent shall be awarded primary possession unless such an order would not be in the best interest of the child because it would significantly impair the child's physical health or emotional development. To hold otherwise would permit the court to apply the presumption in appointing the parent a joint managing conservator but nevertheless choose the primary residence of the child on the basis of a heads-up best interest test, with the court determining which of the parties is the "better" choice. This results in the appointment of a parent as a managing conservator in name only, a paper title which eviscerates the purpose of the statute.

## SEPARATION OF SIBLINGS

 We pause here to note that there is a second hurdle facing Elsa, one which she has not addressed. Where it is possible for siblings to be kept together and reared as a family, it is not in the best interest of the children that they be separated. *Autry v. Autry*, 350 S.W.2d 233, 236 (Tex.Civ.App.—El Paso 1961, writ dism'd). Siblings are not to be separated except upon a showing of clear and compelling reasons. *Dalton v. Doherty*, 670 S.W.2d 422, 424 (Tex.App.—Fort Worth 1984, no writ); *O. v. P.*, 560 S.W.2d 122, 127 (Tex.Civ.App.—Fort Worth 1977, no writ); *Griffith v. Griffith*, 462 S.W.2d 328, 330 (Tex.Civ.App.—Tyler 1970, no writ). The record reflects that Christina and Albert are full-blooded siblings, sharing the same biological father and mother. That being the case, it was Elsa's burden to present clear and compelling reasons that the separation of Christina and Albert was in Christina's best interest.

Pace discussed Christina's relationship with her brother briefly:

Q: Do you have an opinion as to whether or not she has formed an attachment with her brother Albert?

A: I don't know about her attachment to Albert. I think as a child her tendency is to talk about Albert more, because that is who she plays with during the time she is seeing her father.

Q: So because he is a short person like she is, she thinks of him more often?

A: Uh-huh.

. . .

Q: Now, you said that she did not mention her father very often spontaneously, is that correct?

A: That's correct.

Q: And when she did mention him, either spontaneously, or when you were talking about him, were most of her comments about him positive, or negative?

A: Most of her comments centered around having fun playing with her brother.

Q: And how old is Albert?

A: I'm not sure. He is a few years older.

Q: Did she ever have any spontaneous comments about her brother, Albert?

A: Not that I recall.

Q: But she did appear to have fun playing with her brother?

A: Yes.

Q: And you are saying that the current court order you think would be appropriate if continued?

A: I do.

Q: So you think that until Christina—the current order will be in effect a permanent order and will be in effect until the child is eighteen years of age, that until she is eighteen that she should be limited from contact with her father and with her brother, who she enjoys?

A: Yes.

. . .

Q: But you don't think it is harmful to separate her from her father and her brother?

A: Well, the harm, I mean—well, I guess I'm not quite understanding what you are asking.

Q: Well, you realize that Caesar De la Pena and his son Albert live in San Jose, California?

A: I realize that.

Q: I don't know, a thousand, fifteen hundred miles from her, I guess, is that right?

A: That's probably correct.

Q: And just from distance alone it is going to make visitation somewhat difficult, especially if limitation [sic] is limited to Midland County, would you agree with that?

A: I would agree.

Q: But you are still saying that you think it would be in the child's best interest to separate her from her father and her brother?

A: *I don't believe I am saying it would be in her best interest to separate her.* I believe what I am saying is that given that Mr. De la Pena entrusted his child to his sister, and given some of his background and given his behavior the first two times he had access to Christina, then I have some really grave concern about different visitation orders that would perhaps place Christina in California for a longer period of time. [Emphasis added.]

 Caesar offered pictures of the children together, expressing that Christina immediately took to Albert again and was protective of him. He described leaving her behind after the last visitation:

Q: After this last visitation period that you had with your daughter and your son Albert, when it came time to take your daughter home, don't tell us anything your daughter said, but tell the Court what her attitude, or her demeanor was, when it came time to take her home to Elsa?

A: Well, it was just a matter of sense of timing. She was able to figure out that we were getting ice cream, getting our last meal alone, almost, and it was a matter of like she knew it was time to go home and she would cry, and it was very difficult, not just for her, but for my son, very traumatic and as parents very hard.

The trial court made no fact-finding concerning the separation of the siblings, nor does the record reflect that Elsa requested a fact-finding that separation of the siblings was justified by clear and compelling reasons. When the trial court gives express findings on at least one element of a claim or affirmative defense, but omits other elements, implied findings on the omitted unrequested elements are deemed to have been made in support of the judgment. We must, therefore, imply the finding that the separation of Christina and her brother was not in her best interest.

Having concluded that Elsa has not rebutted the parental presumption for purposes of appointing her as Christina's sole managing conservator, we must likewise conclude that she has failed to rebut the presumption for purposes of granting her primary possession in a joint managing conservatorship. We overrule her second issue for review and affirm the judgment.