COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-08-163-CV

 

 

RUSSELL SCOTT MIZE                                                         APPELLANT

 

                                                   V.

 

ROBIN MICHELLE MIZE                                                            APPELLEE

 

                                              ------------

 

              FROM THE 271ST DISTRICT COURT OF WISE COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

 

                                          I.  INTRODUCTION








Appellant Russell Scott Mize appeals the final
decree entered in his divorce case, arguing in three issues that the trial
court erred by appointing Appellee Robin Michelle Mize as the joint managing
conservator with the exclusive right to establish the residence of the minor
children, by awarding property to Robin that was not owned by the community,
and by not entering findings of fact and conclusions of law.  We will affirm the parties= divorce
and the designation of Robin as the primary joint managing conservator, but we
will reverse and remand for a new trial on property division.

                          II.  FACTUAL AND PROCEDURAL BACKGROUND

Robin testified that she and Russell started
dating in March 1998, that they married on or about July 19, 2002, and that
they separated on or about March 21, 2006. 
Russell is the father of two of the three children that were born during
the marriage.

On June 27, 2006, Robin filed for divorce, and
several days later, the trial court entered temporary orders, naming Robin as
the joint managing conservator with the exclusive right to designate the
primary residence of the children.  The
following facts are pertinent to the issues Russell raises on appeal.

A.     Testimony Regarding Primary Custodian

1.     Robin=s
Testimony








Robin testified at the final hearing that she
should be named the primary custodian. 
She mentioned that Russell had called CPS to report her three different
times and that CPS=s investigations did not reveal
any problems with her home.  Robin said
that Russell had slashed her tires, had struggled with her while she was
pregnant and while she was holding both of the girls, had broken into her house
twice, and had cursed at her.  Robin said
that Russell had moved six times since the temporary orders had been entered
and that she believed he was currently living at his girlfriend=s mother=s
house.  Robin expressed concern about
Russell=s living
arrangement because his girlfriend has a criminal history for manufacturing Adope@ and
because his daughters do not have a room of their own at that house.  Robin also said that one of their daughters
has allergies that are aggravated by smoke and that they would be aggravated if
the girls lived with Russell because he, his girlfriend, and his girlfriend=s mother
all smoke in the house.  Robin testified
that Russell is dyslexic and that she was concerned that he would not be able
to help the girls with their homework as they progressed in school.

Robin admitted that she did not list the above
concerns about Russell=s being appointed as the primary
custodian when her deposition was taken because AI was
nervous and he [Russell=s attorney] intimidated me.@  Robin agreed that during her deposition, she
testified that she knew of no reason why Russell should not have custody of the
children.  She said that she was telling
the truth at that time but that she has since remembered things that Russell
has done.  Robin admitted that Russell is
a good dad and that the kids are happy when they are with him.








On cross-examination, Robin denied buying or
using drugs.  She also denied going to
the VFW on July 28 at 2:00 p.m., drinking four beers, and then driving to pick
up her children. 

2.     Investigator=s
Testimony

Richard A. Slatkin, a private investigator,
testified that he began helping Russell with his child custody situation in
2007 by following Robin from her place of employment to various places that she
went.  Slatkin testified that he watched
Robin on June 21 around 2:00 p.m. as she got into her car at work and left the
premises at the same time as another car driven by Robin=s
sister.  Slatkin followed Robin and her
sister to a house in North Richland Hills. 
Slatkin testified that it appeared that Robin and her sister were trying
to get the owner of the house to open the door, but they were
unsuccessful.  They left Robin=s sister=s car at
the house in North Richland Hills and traveled together in Robin=s white
Chevy pickup to an International House of Pancakes at Beach and 820 in Fort
Worth.








Once they arrived at the IHOP, Robin=s sister
went in, and Robin stayed in the pickup, talking on her cell phone.  A vehicle pulled up with a male driver in it,
and he went directly to Robin=s
vehicle.  Slatkin later identified the
man as Michael McDougal.  McDougal
approached the window of Robin=s
vehicle, she gave him cash, and he reached into his shirt pocket and handed her
a clear plastic envelope.  Slatkin
testified that he was too far away to be able to see whether there was any
substance in it.  After the exchange,
McDougal got back in his car and left. 
Slatkin took pictures of what he saw on June 21, and the trial court
admitted the photographs.  Slatkin also
wrote down McDougal=s license plate.[2]  Slatkin testified that after McDougal left,
Robin made a phone call on her cell phone, and her sister came out of the
IHOP.  Together, the two sisters drove
back to the house in North Richland Hills.

Slatkin followed Robin again on July 28,
2007.  On that date, he followed her from
her work to a VFW bar.  Slatkin went
inside and watched Robin drink four beers in an hour and fifteen minutes.  Slatkin watched the bar maid pour the
tap.  Afterwards, Robin drove to the post
office in Newark.  Slatkin testified that
Robin=s
driving was erratic, so he called the police to report a drunk driver.  After the post office, Robin drove to Russell=s mother=s house
to pick up her children.

3.     Russell=s
Testimony








Russell said that he did not know of any reason
why Robin would suddenly testify that he should not have custody.  Russell admitted that he smokes but testified
that his daughter is not allergic to smoke. 
He said that he can provide a better atmosphere for the children because
he can support them, can cook for them, and can make sure their needs are taken
care of.  Russell testified that because
he is self-employed,[3]
he has a flexible schedule and would be available to take care of the children
if they became sick at school or daycare. 
Though he is currently living with Sharon Gilbert and her mother, he
hopes to soon return to living at his own house.

Russell said that Robin does not provide a
healthy environment for the children because there is dog feces on their
clothes, in their rooms, and in the living room.  He testified that Robin does not have the
right car seats for the children and that she feeds the children frozen pot
pies and pizza or food from McDonald=s.  He also expressed concern about Robin=s A[r]unning
around, drinking all the time.@  He testified that he had smelled alcohol on
Robin three or four times when she had come to pick up the children.  He stated that he wants Robin to go to drug
and alcohol classes and to have supervised visitation until she completes the
classes.








4.     Robin=s
Rebuttal Testimony

Robin testified that on June 21, 2007, she went
to look at a house to buy, and her sister came with her.  Robin did not remember the particular house,
saying that she had looked at several houses. 
Afterwards, her sister interviewed at IHOP.  Robin could not recall why her sister did not
drive herself to the interview since she had driven her car to the house in
North Richland Hills.  Robin said that
the man who came up to her window Awas just
some random guy@ who wanted to know where a pawn
shop was and tried to sell her a bracelet, but she told him that she did not
have any money and was not interested in purchasing the bracelet.

Robin said that on July 28, 2007, she had a Coke
at the VFW.  She said that she knows she
had a can of Coke because that is what she orders every time she drives there. 

B.     Property Owned by the Parties

1.     Real Property

Robin testified that Russell owned 509 Rogers A
and 509 Rogers B in Newark when she met him. 
During their marriage, they added to the properties an air conditioner
that cost $2,900 and a Rain Soft System that cost $900.








In 1999, while they were living together but
before they were married, Robin and Russell purchased 410 Rogers.  In 2002, also before they were married, Robin
and Russell purchased a lot on Wilson Street and moved a house onto the
property.  Robin asked the court to award
her one-half the cost of the improvementsCthe air
conditioner, the Rain Soft System, and the relocated houseCmade to
Russell=s
separate property on her claim for economic contribution.  Robin testified that she came up with the
values for the property listed on her initial inventory by checking the deeds
to obtain the original loan amount and by calling the bank to obtain the ending
loan balances on properties for which she had not received a statement.

Russell testified that he is currently residing
at 9561 Houston Hill Road because he had to rent out his house in order to earn
money to pay bills.  The parties do not
dispute that Russell purchased two pieces of property in the Cain T. Brush
Survey (509 Rogers) prior to the marriage, along with property in the C.R. Huff
Survey and some land from the Rawlings family that consists of several lots on
which there is an auto repair shop, a trailer, and a house.








Russell said that he and Robin had refinanced the
property known as 509 Rogers A and B at some point during their marriage, that
the loan was for $58,000, and that the balance is currently about $49,000.  With regard to the $37,000 that they received
from refinancing the loan on that property, Russell testified that Robin Ablew it.@  They later took out an additional $20,000 loan
on the property, and the balance is currently about $16,000.  The Wilson property that Russell purchased
right before the marriage for $70,000 has been paid off.  He agreed that they had moved a house onto
the property and added an air conditioner and Rain Soft System to the house
located at 509 Rogers.  He testified that
ninety percent of the money in their joint checking account came from rental
income and that money was used to purchase the air conditioner and different
systems for the real estate.

2.     Vehicles and Trailers

Russell=s
counsel questioned Robin about several of the vehicles that she had listed on
her inventory, but she did not know whether the vehicles were titled in either
of their names; she said that they had worked on the vehicles and bought things
for them.  After Robin and Russell
separated, they each bought new vehicles.

Robin identified a 1970 Corvette that was sitting
behind the shop in a picture and said that she was asking for it.  She also identified a box trailer and
disputed that it was Russell=s mother=s
property.  Although Robin requested to be
awarded the trailer, she had no idea who it was registered to.








Russell testified that he had inherited a 1992
red extended cab GMC pickup from his grandfather and owned a boat and large box
trailer prior to the marriage.  He stated
that he does not own the 1995 one-ton pickup, the black Dodge pickup, the 1970
Corvette, the 1970 brown Chevy pickup, the 1970 white Chevy pickup, a 2004 Ford
diesel pickup, a 1970 or 1980 wrecker pickup, a blue Chevy S10, a dump truck, a
white boat with motor and trailer, any rent car hauling trailers, a blue
trailer, an old black trailer, a black mower trailer, a medium box trailer, a
small box trailer, a Bobcat, a skid steer, a new tractor, or an old tractorCall
items listed in Robin=s inventory.  Russell said that he owns a 2006 Chevy
pickup, which he bought after he and Robin separated, and that he owns a blue
1984 Skeeter boat with a trailer and motor. 
He said that Robin bought a 2003 Chevy pickup after they separated.  He testified that they do own an old white
van that is used for storing junk. 
Russell testified that he owned a red sixteen-foot trailer prior to the
marriage but that it was stolen after Robin=s sister
borrowed it; he bought a new black trailer to replace it.

C.     Trial Court=s
Disposition








After hearing the above evidence, the trial court
ordered Robin to immediately report for a drug screen, which came back
negative, and took the matter under advisement. 
Approximately four months later, the trial court signed the final
decree, naming Robin the joint managing conservator with the exclusive right to
designate the primary residence of the children.[4]  The trial court did not award Robin any real
property but did award her a judgment against Russell in the amount of $24,677 A[f]or
the purpose of a just and right division of property,@ and it
awarded Robin the following vehicles: a 1995 one-ton pickup, a black Dodge, a
1970 Corvette, a 1970=s Chevrolet brown pickup, a 2003
Chevrolet 1500 pickup, a blue boat with a trailer and motor, an aluminum boat
with a trailer and motor, a black trailer (new), and a medium box trailer.  On appeal, Russell challenges the preceding
rulings of the trial court.

         III.  UNTIMELY REQUEST
FOR FINDINGS OF FACT AND CONCLUSIONS
OF LAW

In his third issue, Russell argues that the trial
court erred by failing to enter findings of fact and conclusions of law.  Robin responds that the trial court properly
denied Russell=s request for findings of fact
and conclusions of law because his request was filed more than twenty days
after the final judgment was signed.








Texas Rule of Civil Procedure 296 states that A[i]n any
case tried in the district or county court without a jury, any party may
request the court to state in writing its findings of fact and conclusions of
law.  Such request . . . shall be filed
within twenty days after judgment is signed . . . .@  Tex. R. Civ. P. 296.  Moreover, Texas Rule of Civil Procedure 306a
provides that the date of the judgment Ashall
determine the beginning of the periods prescribed by these rules for . . .
filing in the trial court the various documents that these rules authorize a
party to file within such periods, including . . . requests for findings of
fact and conclusions of law.@  Tex. R. Civ. P. 306a.  A motion for new trial thus does not extend
the time for filing a request for findings of fact and conclusions of law.  See Mengel v. State, No.
13-02-00618-CV, 2004 WL 1932751, at *2B3 (Tex.
App.CCorpus
Christi Aug. 31, 2004, no pet.) (mem. op.); see also Commercial Union Ins.
Co. v. La Villa ISD, 779 S.W.2d 102, 110 (Tex. App.CCorpus
Christi 1989, no writ) (analyzing prior version of rule 296 and holding that
the filing of a motion for new trial does not extend the period within which a
request for findings of fact and conclusions of law must be filed).








Here, the record reveals that the trial court
signed the final decree of divorce on January 28, 2008.  Russell filed his motion for new trial on
February 21, 2008, and the trial court denied it on March 31, 2008.  Russell thereafter filed his notice of appeal
on April 15, 2008, and nine days later filed a request for findings of fact and
conclusions of law.  Russell=s
request for findings of fact and conclusions of law, which was filed almost
four months after the final judgment was signed, was untimely and was therefore
properly denied by the trial court.  See
Mengel, 2004 WL 1932751, at *2B3; see
also Commercial Union Ins. Co., 779 S.W.2d at 110.  We overrule Russell=s third
issue.[5]

                               IV.  RIGHT TO ESTABLISH RESIDENCE

In his first issue, Russell argues that the trial
court abused its discretion by appointing Robin as the joint managing
conservator with the exclusive right to establish the residence of the minor
children.  Specifically, Russell argues
that Robin did not demonstrate that she would provide a safe, stable,
nonviolent environment for the children.








The family code establishes the best interest of
the child as the primary consideration when courts determine conservatorship of
a child.  Tex. Fam. Code Ann. ' 153.002
(Vernon 2008).  Section 153.134
authorizes a court to name both parents joint managing conservators if it finds
such a designation is in the best interest of the child.  Id. '
153.134(a) (Vernon 2008).  Section
153.134(b) requires an order naming joint managing conservators to designate
one as having the exclusive right to determine the child=s
primary residence, to allocate other rights and responsibilities of the
parents, and to include provisions to minimize disruption of the child=s
education, daily routine, and association with friends.  Id. '
153.134(b).

Trial courts are afforded wide discretion in
making determinations of custody, possession, and visitation.  In re Marriage of Walker, No.
07-03-00531-CV, 2005 WL 3488931, at *3 (Tex. App.CAmarillo
Dec. 20, 2005, no pet.) (mem. op.) (citing Gillespie v. Gillespie, 644
S.W.2d 449, 451 (Tex. 1982)).  To
determine whether a trial court abused its discretion, we must decide whether
the trial court acted without reference to any guiding rules or principles; in
other words, we must decide whether the act was arbitrary or unreasonable.  Cire v. Cummings, 134 S.W.3d 835, 838B39 (Tex.
2004).  An appellate court cannot
conclude that a trial court abused its discretion merely because the appellate
court would have ruled differently in the same circumstances.  E.I. du Pont de Nemours & Co. v.
Robinson, 923 S.W.2d 549, 558 (Tex. 1995).








As discussed above, the trial court in the case
at hand did not make findings of fact and conclusions of law.  The record before us, however, demonstrates
that the trial court heard negative points about both Robin and Russell.  The trial court had before it testimony that
Russell had moved six times since the temporary orders were entered, that he
was living with a woman with drug convictions, that his two daughters did not
have their own room and often shared a room with the woman with drug
convictions, that Russell had committed acts of domestic violence against
Robin, that he smoked and lived with other smokers, and that he could not read
well.  The trial court heard testimony
from Russell that Robin=s house had dog feces throughout
several rooms, that she did not cook for the children, and that she did not
have the right car seats for the children. 
The trial court received conflicting testimony regarding whether one of
the children was allergic to smoke and whether Robin abused alcohol.  The trial court also heard Robin admit that
Russell was a good father and that she had failed to mention her concerns about
his shortcomings during her deposition. 
Yet, the trial court was in the best position to weigh all of the
testimony at the final hearing, including Robin=s Anew@
testimony, because the judge who heard the above evidence and signed the final
decree had previously heard other motions argued by the parties and could weigh
their credibility.  See In re De la
Pena, 999 S.W.2d 521, 526 (Tex. App.CEl Paso
1999, no pet.) (stating that appellate court must give deference to trial court
because it is in the best position to observe the demeanor of the witnesses and
evaluate their credibility).








Giving great deference to the trial court=s
decision because it observed the witnesses and was able to assess intangibles
not apparent in the written record, we hold that the trial court did not abuse
its discretion by appointing Robin as the joint managing conservator with the
right to establish the children=s
primary residence.  See Swaab v. Swaab,
No. 14-06-00593-CV, 2008 WL 1838023, at *13 (Tex. App.CHouston
[14th Dist.] Apr. 24, 2008, no pet. h.) (holding that trial court did not abuse
its discretion by appointing mother as joint managing conservator with the
exclusive right to establish the child=s
primary residence when evidence showed that mother worked long hours and father=s house
was messy); Shoemake v. Shoemake, No. 13-05-00421-CV, 2007 WL 1288815,
at *6 (Tex. App.CCorpus Christi May 3, 2007, no
pet.) (mem. op.) (upholding trial court=s
decision to give father the right to determine the children=s
primary residence even though record contained conflicting evidence that both
mother and father could provide a stable, loving environment).  We overrule Russell=s first
issue.

                                      V.  PROPERTY DIVISION

In his second issue, Russell contends that the
trial court abused its discretion by awarding Robin property that was not owned
by the community estate.  Specifically,
Russell complains that several of the vehicles that Robin was awarded are not
owned by the community estate and that the trial court abused its discretion by
ordering him to pay Robin $24,677 to reimburse her for economic contributions
she made to his separate property.








A.     Standard of Review 

We recognize the trial court has wide discretion
in dividing the marital estate, and we presume that the trial court exercised
its discretion properly.  Murff v.
Murff, 615 S.W.2d 696, 698B99 (Tex.
1981).  In dividing the estate of the
parties, the trial court shall order a division of the property Athat the
court deems just and right, having due regard for the rights of each party and
any children of the marriage.@  Tex. Fam. Code Ann. '7.001(Vernon
2006).  The trial judge may order an
unequal division of marital property when a reasonable basis exists for doing
so.  Massey v. Massey, 807 S.W.2d
391, 398 (Tex. App.CHouston [1st Dist.] 1991, writ
denied) (citing Murff, 615 S.W.2d at 698B99).  This court will correct the trial court=s
division of marital property only when an abuse of discretion has been
shown.  Murff, 615 S.W.2d at
698.  It is the duty of this court to
indulge every reasonable presumption in favor of the proper exercise of
discretion by the trial court in dividing the community estate.  Id.








The family code and the Texas constitution
provide that, with a few exceptions, all property acquired during a marriage is
presumed to be community property.  Tex.
Const. art. XVI, ' 15 ; Tex. Fam. Code Ann. ' 5.02
(Vernon 2006).  Property possessed by
either party during or on dissolution of the marriage is presumed to be
community property unless that presumption is rebutted by clear and convincing
evidence.  Tex. Fam. Code Ann. ' 5.02.

B.     No Evidence of Ownership of Vehicles

In the first part of his second issue, Russell
complains about the vehicles that the trial court awarded to Robin.  The decree reflects that the trial court
awarded Robin a 1995 one-ton pickup, a black Dodge, a 1970 Corvette, a 1970
Chevrolet brown pickup, a 2003 Chevrolet 1500 pickup, a blue boat with a
trailer and motor, an aluminum boat with a trailer and motor, a black trailer
(new), and a medium box trailer.  Of
these nine items, Russell contends that the parties owned only Robin=s 2003
Chevy pickup.

The trial court had before it Robin=s
amended inventory and appraisement, listing numerous vehicles.  On direct examination, Robin testified that
she believed that the inventory reflected a complete list of the parties= assets
and debts.  On cross-examination,
however, Russell=s counsel questioned Robin about
several of the items that she had included on her inventory:

Q:     Mrs[.] Mize, you said the
community owns a >92 red extended cab
pickup; correct?

 

A.     No.  Just that that=s everything that we=ve had.

 

Q.     Okay.  I just want to clarify it so the Judge
understands what you=re saying.

 

. . . .








All right.  Okay.  One-ton pickup, isn=t that-- doesn=t that belong to your
mother-in-law, Mr. Mize=s mother?

 

A.     It=s in her name, but it=s Russell=s pickup.

 

Q.     Okay.  So it=s registered to her?

 

A.     Yes.

 

Q.     Okay.  No. 3 is a black Dodge pickup, and isn=t it true that that=s a disabled pickup that
belongs to a former customer?

 

A.     It=s a disabled pickup that
Russell=s dad, he purchased.

 

Q.     That
Russell what?

 

A.     He
said he purchased.

 

Q.     He
said he purchased it?

 

A.     Yes.

 

. . . .

 

Q.     That >70 Corvette, that=s been gone for two
years; correct?

 

A.     No.

 

Q.     No.

 

>70 brown Chevy pickup,
that belongs to a customer being repaired; correct?

 

A.     I don=t believe so.

 

Q.     Okay.  Well, let me ask you this:  Do you know if there is a title in either
your name or Russell=s name for any of these
vehicles that you=ve listed here?








A.     No, because when you own
it -- the makeover title-- and to my knowledge, he never got it running, or we
would=ve switched over the
Corvette.

 

Q.     So would it be fair to say
that these are all vehicles that you=ve seen at some time or another in the-- in or
around your husband over the years?

 

A.     Yes.  We=ve worked on them.  We bought things for them.

 

Q.     And do you know where
these vehicles are currently located at all?

 

A.     Some
of them, yes.

 

Q.     Okay.  And do you know if any of them are
registered to yourself or to your husband?

 

A.     No, I
don=t. [Emphasis added.] 

 

. . . .

 

Q.     Are
you asking the Court to give you that trailer?

 

A.     Yes.

 

Q.     And
do you have any idea who it is registered to?

 

A.     No.

 

Q.     Do
you have any idea when it was purchased?

 

THE COURT:       Hold
it.

 

Do you?

 

I mean, all these vehicles, where [are] the titles?

 








[Russell=s attorney]:      Oh, I do. 
It=s registered to Shirley
Mize.

 

THE COURT:       Pardon?

 

[Russell=s attorney]:      It=s registered to his
mother.

 

THE COURT:       Are there car
titles to these vehicles?

 

[Russell=s attorney]:      There are no titles to anything.  This [Robin=s efforts to be awarded
the property listed on her inventory] is just a Athrow it at the wall and
see what sticks.@ 

 

Additionally, Russell specifically testified that the parties do not
own the one-ton pickup, the black Dodge pickup, the 1970 Corvette, the 1970
brown Chevy pickup, or the medium box trailer. 









As reflected above, the evidence of ownership
presented to the trial court was sketchy. 
Although there is normally a presumption that property possessed by
either party during or on dissolution of the marriage is presumed to be
community property, that presumption appears to have no application in this
case because there was no evidence that the vehicles were owned or acquired by
the parties.  Robin admitted that Russell
had previously owned and operated an auto repair shop at which Robin had seen
some of the vehicles that she had listed on her inventory.  Robin admitted that the one-ton truck was
registered to Russell=s mother, that his dad had
purchased the black Dodge, and that although she could identify the Corvette
and the trailer in the pictures, she did not know under whose name they were
registered.  One of the attorneys
proffered that the trailer was registered to Russell=s
mother.  And Russell testified that the
parties do not own the one-ton pickup, the black Dodge pickup, the 1970
Corvette, the 1970 brown Chevy pickup, or the medium box trailer.  Even affording the trial court wide
discretion in making the property division as it sees fit, we cannot say that
the trial court did not abuse its discretion in awarding vehicles to Robin that
the community does not own.  We therefore
hold that the trial court abused its discretion by awarding Robin vehicles in
the absence of evidence that the parties owned them.  See Panozzo v. Panozzo, 904 S.W.2d
780, 786 (Tex. App.CCorpus Christi 1995, no writ)
(holding that trial court abused its discretion in awarding wife eighty pieces
of commercial equipment located at Euro-Mex because there was no evidence as to
the ownership of the equipment, the equipment was not in the possession of
either party at the time of dissolution, and the relationship of the parties to
Euro-Mex was not clear from the record). 
But see Lusk v. Gen. Motors Acceptance Corp., 395 S.W.2d 847, 849B50 (Tex.
Civ. App.CTyler 1965, no writ) (holding
that wife=s name on certificate of title
would not, without further proof, be sufficient to overcome community property
presumption when both husband and wife had testified that car belonged to them
jointly).  We sustain the first part of
Russell=s second
issue.








C.     Economic Contribution

In the second part of his second issue, Russell
contends that the trial court abused its discretion by awarding Robin $24,677
with six percent interest against Russell Afor the
purpose of a just and right division of property@ because
such an award was not supported by the evidence.  Specifically, Russell contends that Robin
failed to bring forth sufficient evidence for the factfinder to determine the
enhancement value of his separate property. 
Robin responds that her proposed property distribution Acontained
the information needed to compute the economic contribution formula and
reimbursement.@ 








Here, the trial court had before it Robin=s
proposed property distribution, claiming that she was owed $18,065 in equity on
community property, $14,404 in reimbursement, and at least $37,714  in economic contribution claims.  The trial court also had before it testimony
from Russell that he earned $1,900 a month from renting the properties and that
the parties had resided at one of the properties during the marriage.  After hearing the above evidence, the trial
court awarded Robin $24,677 Afor the
purpose of a just and right division of property@ and did
not break down the amount into economic contribution, reimbursement, or
equity.  Without the benefit of findings
of fact and conclusions of law, we have no way of knowing exactly what the
trial court factored in when calculating the $24,677, but we presume the trial
court considered the appropriate offsetting community benefits, to the extent
the evidence revealed such, and applied the appropriate formulas in arriving at
its number.  However, because we are
remanding for a new trial on the property division because vehicles were
awarded to Robin that were not proved to be part of the community estate, the
trial court may or may not decide to adjust the $24,677 award to effectuate a
just and right division of property.  We
are confident that the trial court will again apply the appropriate formulas
and consider appropriate offsetting community benefits, to the extent the
evidence reveals such, in arriving at the final amount, if any, that will
create a just and right division of the property.  See generally Rusk v. Rusk, 5 S.W.3d 299,
310 (Tex. App.CHouston [14th Dist.] 1999, pet.
denied) (holding that on remand the trial court should consider offsetting
community benefitsCrent-free living in property,
subsequent rental income from property, tax breaks, and depreciationCin
determining award to wife on reimbursement claims).  We therefore sustain the second part of
Russell=s second
issue.

                                          VI.  CONCLUSION








Having overruled Russell=s first
and third issues, we affirm the parties= divorce
and the designation of Robin as the primary joint managing conservator, but
having sustained Russell=s second issue, we reverse and
remand to the trial court for a new trial on the property division.  See Tex. R. App. P. 43.2(a), (d),
43.3, 44.1(b).

 

SUE
WALKER

JUSTICE

 

PANEL: CAYCE, C.J.;
DAUPHINOT and WALKER, JJ.

 

DELIVERED:  February 5, 2009











[1]See Tex. R. App. P. 47.4.





[2]A search of the license
plate revealed that McDougal has a criminal history that includes delivery of
drugs, delivery of simulated controlled drugs, theft, resisting arrest, and
evading arrest.





[3]Robin testified that
Russell is a mechanic and had run his own auto repair shop for years.  Russell testified that he is currently
self-employed, performing odd jobs and doing maintenance on houses.





[4]Robin testified at trial
that she plans to move from Wise County to the Keller ISD in Tarrant County.





[5]Russell also argues under
his third issue that ARule 296 of the Texas Rules
of Civil Procedure and the cases thereunder should be overruled by this Court
because the cases tell us that the findings of fact and conclusions of law are
a substitute for the jury verdict in a jury trial@ and that A[a] simple solution to
the problem is to change the Rules of Procedure to say that the Notice of
Appeal under Rule 25 of the Texas Rules of Appellate Procedure is also a
request for findings of fact and conclusions of law.@  We decline Russell=s request to revise the
rules.