

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 2-08-163-CV**

RUSSELL SCOTT MIZE                                                    APPELLANT

V.

ROBIN MICHELLE MIZE                                                    APPELLEE

------------

### FROM THE 271ST DISTRICT COURT OF WISE COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Appellant Russell Scott Mize appeals the final decree entered in his divorce case, arguing in three issues that the trial court erred by appointing Appellee Robin Michelle Mize as the joint managing conservator with the exclusive right to establish the residence of the minor children, by awarding property to Robin that was not owned by the community, and by not entering

---

[1] *See* Tex. R. App. P. 47.4.

findings of fact and conclusions of law. We will affirm the parties' divorce and the designation of Robin as the primary joint managing conservator, but we will reverse and remand for a new trial on property division.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Robin testified that she and Russell started dating in March 1998, that they married on or about July 19, 2002, and that they separated on or about March 21, 2006. Russell is the father of two of the three children that were born during the marriage.

On June 27, 2006, Robin filed for divorce, and several days later, the trial court entered temporary orders, naming Robin as the joint managing conservator with the exclusive right to designate the primary residence of the children. The following facts are pertinent to the issues Russell raises on appeal.

### A. Testimony Regarding Primary Custodian

#### 1. Robin's Testimony

Robin testified at the final hearing that she should be named the primary custodian. She mentioned that Russell had called CPS to report her three different times and that CPS's investigations did not reveal any problems with her home. Robin said that Russell had slashed her tires, had struggled with her while she was pregnant and while she was holding both of the girls, had broken

2

into her house twice, and had cursed at her. Robin said that Russell had moved six times since the temporary orders had been entered and that she believed he was currently living at his girlfriend's mother's house. Robin expressed concern about Russell's living arrangement because his girlfriend has a criminal history for manufacturing "dope" and because his daughters do not have a room of their own at that house. Robin also said that one of their daughters has allergies that are aggravated by smoke and that they would be aggravated if the girls lived with Russell because he, his girlfriend, and his girlfriend's mother all smoke in the house. Robin testified that Russell is dyslexic and that she was concerned that he would not be able to help the girls with their homework as they progressed in school.

Robin admitted that she did not list the above concerns about Russell's being appointed as the primary custodian when her deposition was taken because "I was nervous and he [Russell's attorney] intimidated me." Robin agreed that during her deposition, she testified that she knew of no reason why Russell should not have custody of the children. She said that she was telling the truth at that time but that she has since remembered things that Russell has done. Robin admitted that Russell is a good dad and that the kids are happy when they are with him.

On cross-examination, Robin denied buying or using drugs. She also denied going to the VFW on July 28 at 2:00 p.m., drinking four beers, and then driving to pick up her children.

### 2. Investigator's Testimony

Richard A. Slatkin, a private investigator, testified that he began helping Russell with his child custody situation in 2007 by following Robin from her place of employment to various places that she went. Slatkin testified that he watched Robin on June 21 around 2:00 p.m. as she got into her car at work and left the premises at the same time as another car driven by Robin's sister. Slatkin followed Robin and her sister to a house in North Richland Hills. Slatkin testified that it appeared that Robin and her sister were trying to get the owner of the house to open the door, but they were unsuccessful. They left Robin's sister's car at the house in North Richland Hills and traveled together in Robin's white Chevy pickup to an International House of Pancakes at Beach and 820 in Fort Worth.

Once they arrived at the IHOP, Robin's sister went in, and Robin stayed in the pickup, talking on her cell phone. A vehicle pulled up with a male driver in it, and he went directly to Robin's vehicle. Slatkin later identified the man as Michael McDougal. McDougal approached the window of Robin's vehicle, she gave him cash, and he reached into his shirt pocket and handed her a clear

4

plastic envelope. Slatkin testified that he was too far away to be able to see whether there was any substance in it. After the exchange, McDougal got back in his car and left. Slatkin took pictures of what he saw on June 21, and the trial court admitted the photographs. Slatkin also wrote down McDougal's license plate.[2] Slatkin testified that after McDougal left, Robin made a phone call on her cell phone, and her sister came out of the IHOP. Together, the two sisters drove back to the house in North Richland Hills.

Slatkin followed Robin again on July 28, 2007. On that date, he followed her from her work to a VFW bar. Slatkin went inside and watched Robin drink four beers in an hour and fifteen minutes. Slatkin watched the bar maid pour the tap. Afterwards, Robin drove to the post office in Newark. Slatkin testified that Robin's driving was erratic, so he called the police to report a drunk driver. After the post office, Robin drove to Russell's mother's house to pick up her children.

### 3. Russell's Testimony

Russell said that he did not know of any reason why Robin would suddenly testify that he should not have custody. Russell admitted that he

---

[2] A search of the license plate revealed that McDougal has a criminal history that includes delivery of drugs, delivery of simulated controlled drugs, theft, resisting arrest, and evading arrest.

5

smokes but testified that his daughter is not allergic to smoke. He said that he can provide a better atmosphere for the children because he can support them, can cook for them, and can make sure their needs are taken care of. Russell testified that because he is self-employed,[3] he has a flexible schedule and would be available to take care of the children if they became sick at school or daycare. Though he is currently living with Sharon Gilbert and her mother, he hopes to soon return to living at his own house.

Russell said that Robin does not provide a healthy environment for the children because there is dog feces on their clothes, in their rooms, and in the living room. He testified that Robin does not have the right car seats for the children and that she feeds the children frozen pot pies and pizza or food from McDonald's. He also expressed concern about Robin's "[r]unning around, drinking all the time." He testified that he had smelled alcohol on Robin three or four times when she had come to pick up the children. He stated that he wants Robin to go to drug and alcohol classes and to have supervised visitation until she completes the classes.

---

[3] Robin testified that Russell is a mechanic and had run his own auto repair shop for years. Russell testified that he is currently self-employed, performing odd jobs and doing maintenance on houses.

**4. Robin's Rebuttal Testimony**

Robin testified that on June 21, 2007, she went to look at a house to buy, and her sister came with her. Robin did not remember the particular house, saying that she had looked at several houses. Afterwards, her sister interviewed at IHOP. Robin could not recall why her sister did not drive herself to the interview since she had driven her car to the house in North Richland Hills. Robin said that the man who came up to her window "was just some random guy" who wanted to know where a pawn shop was and tried to sell her a bracelet, but she told him that she did not have any money and was not interested in purchasing the bracelet.

Robin said that on July 28, 2007, she had a Coke at the VFW. She said that she knows she had a can of Coke because that is what she orders every time she drives there.

**B. Property Owned by the Parties**

**1. Real Property**

Robin testified that Russell owned 509 Rogers A and 509 Rogers B in Newark when she met him. During their marriage, they added to the properties an air conditioner that cost $2,900 and a Rain Soft System that cost $900.

In 1999, while they were living together but before they were married, Robin and Russell purchased 410 Rogers. In 2002, also before they were

7

married, Robin and Russell purchased a lot on Wilson Street and moved a house onto the property. Robin asked the court to award her one-half the cost of the improvements—the air conditioner, the Rain Soft System, and the relocated house—made to Russell's separate property on her claim for economic contribution. Robin testified that she came up with the values for the property listed on her initial inventory by checking the deeds to obtain the original loan amount and by calling the bank to obtain the ending loan balances on properties for which she had not received a statement.

Russell testified that he is currently residing at 9561 Houston Hill Road because he had to rent out his house in order to earn money to pay bills. The parties do not dispute that Russell purchased two pieces of property in the Cain T. Brush Survey (509 Rogers) prior to the marriage, along with property in the C.R. Huff Survey and some land from the Rawlings family that consists of several lots on which there is an auto repair shop, a trailer, and a house.

Russell said that he and Robin had refinanced the property known as 509 Rogers A and B at some point during their marriage, that the loan was for $58,000, and that the balance is currently about $49,000. With regard to the $37,000 that they received from refinancing the loan on that property, Russell testified that Robin "blew it." They later took out an additional $20,000 loan on the property, and the balance is currently about $16,000. The Wilson

8

property that Russell purchased right before the marriage for $70,000 has been paid off. He agreed that they had moved a house onto the property and added an air conditioner and Rain Soft System to the house located at 509 Rogers. He testified that ninety percent of the money in their joint checking account came from rental income and that money was used to purchase the air conditioner and different systems for the real estate.

### 2. Vehicles and Trailers

Russell's counsel questioned Robin about several of the vehicles that she had listed on her inventory, but she did not know whether the vehicles were titled in either of their names; she said that they had worked on the vehicles and bought things for them. After Robin and Russell separated, they each bought new vehicles.

Robin identified a 1970 Corvette that was sitting behind the shop in a picture and said that she was asking for it. She also identified a box trailer and disputed that it was Russell's mother's property. Although Robin requested to be awarded the trailer, she had no idea who it was registered to.

Russell testified that he had inherited a 1992 red extended cab GMC pickup from his grandfather and owned a boat and large box trailer prior to the marriage. He stated that he does not own the 1995 one-ton pickup, the black Dodge pickup, the 1970 Corvette, the 1970 brown Chevy pickup, the 1970

9

white Chevy pickup, a 2004 Ford diesel pickup, a 1970 or 1980 wrecker pickup, a blue Chevy S10, a dump truck, a white boat with motor and trailer, any rent car hauling trailers, a blue trailer, an old black trailer, a black mower trailer, a medium box trailer, a small box trailer, a Bobcat, a skid steer, a new tractor, or an old tractor—all items listed in Robin's inventory. Russell said that he owns a 2006 Chevy pickup, which he bought after he and Robin separated, and that he owns a blue 1984 Skeeter boat with a trailer and motor. He said that Robin bought a 2003 Chevy pickup after they separated. He testified that they do own an old white van that is used for storing junk. Russell testified that he owned a red sixteen-foot trailer prior to the marriage but that it was stolen after Robin's sister borrowed it; he bought a new black trailer to replace it.

### C.   Trial Court's Disposition

After hearing the above evidence, the trial court ordered Robin to immediately report for a drug screen, which came back negative, and took the matter under advisement. Approximately four months later, the trial court signed the final decree, naming Robin the joint managing conservator with the exclusive right to designate the primary residence of the children.[4]  The trial

---

[4] Robin testified at trial that she plans to move from Wise County to the Keller ISD in Tarrant County.

10

court did not award Robin any real property but did award her a judgment against Russell in the amount of $24,677 "[f]or the purpose of a just and right division of property," and it awarded Robin the following vehicles: a 1995 one-ton pickup, a black Dodge, a 1970 Corvette, a 1970's Chevrolet brown pickup, a 2003 Chevrolet 1500 pickup, a blue boat with a trailer and motor, an aluminum boat with a trailer and motor, a black trailer (new), and a medium box trailer. On appeal, Russell challenges the preceding rulings of the trial court.

### III. UNTIMELY REQUEST FOR FINDINGS OF FACT AND CONCLUSIONS OF LAW

In his third issue, Russell argues that the trial court erred by failing to enter findings of fact and conclusions of law. Robin responds that the trial court properly denied Russell's request for findings of fact and conclusions of law because his request was filed more than twenty days after the final judgment was signed.

Texas Rule of Civil Procedure 296 states that "[i]n any case tried in the district or county court without a jury, any party may request the court to state in writing its findings of fact and conclusions of law. Such request . . . shall be filed within twenty days after judgment is signed . . . ." Tex. R. Civ. P. 296. Moreover, Texas Rule of Civil Procedure 306a provides that the date of the judgment "shall determine the beginning of the periods prescribed by these rules for . . . filing in the trial court the various documents that these rules authorize

11

a party to file within such periods, including . . . requests for findings of fact and conclusions of law." Tex. R. Civ. P. 306a. A motion for new trial thus does not extend the time for filing a request for findings of fact and conclusions of law. *See Mengel v. State*, No. 13-02-00618-CV, 2004 WL 1932751, at *2–3 (Tex. App.—Corpus Christi Aug. 31, 2004, no pet.) (mem. op.); *see also Commercial Union Ins. Co. v. La Villa ISD*, 779 S.W.2d 102, 110 (Tex. App.—Corpus Christi 1989, no writ) (analyzing prior version of rule 296 and holding that the filing of a motion for new trial does not extend the period within which a request for findings of fact and conclusions of law must be filed).

Here, the record reveals that the trial court signed the final decree of divorce on January 28, 2008. Russell filed his motion for new trial on February 21, 2008, and the trial court denied it on March 31, 2008. Russell thereafter filed his notice of appeal on April 15, 2008, and nine days later filed a request for findings of fact and conclusions of law. Russell's request for findings of fact and conclusions of law, which was filed almost four months after the final judgment was signed, was untimely and was therefore properly denied by the

trial court.  *See Mengel*, 2004 WL 1932751, at *2–3; *see also Commercial Union Ins. Co.*, 779 S.W.2d at 110.  We overrule Russell's third issue.[5]

## IV.  RIGHT TO ESTABLISH RESIDENCE

In his first issue, Russell argues that the trial court abused its discretion by appointing Robin as the joint managing conservator with the exclusive right to establish the residence of the minor children.  Specifically, Russell argues that Robin did not demonstrate that she would provide a safe, stable, nonviolent environment for the children.

The family code establishes the best interest of the child as the primary consideration when courts determine conservatorship of a child.  Tex. Fam. Code Ann. § 153.002 (Vernon 2008).  Section 153.134 authorizes a court to name both parents joint managing conservators if it finds such a designation is in the best interest of the child.  *Id.* § 153.134(a) (Vernon 2008).  Section 153.134(b) requires an order naming joint managing conservators to designate one as having the exclusive right to determine the child's primary residence, to

---

[5] Russell also argues under his third issue that "Rule 296 of the Texas Rules of Civil Procedure and the cases thereunder should be overruled by this Court because the cases tell us that the findings of fact and conclusions of law are a substitute for the jury verdict in a jury trial" and that "[a] simple solution to the problem is to change the Rules of Procedure to say that the Notice of Appeal under Rule 25 of the Texas Rules of Appellate Procedure is also a request for findings of fact and conclusions of law."  We decline Russell's request to revise the rules.

13

allocate other rights and responsibilities of the parents, and to include provisions to minimize disruption of the child's education, daily routine, and association with friends. *Id.* § 153.134(b).

Trial courts are afforded wide discretion in making determinations of custody, possession, and visitation. *In re Marriage of Walker*, No. 07-03-00531-CV, 2005 WL 3488931, at *3 (Tex. App.—Amarillo Dec. 20, 2005, no pet.) (mem. op.) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

As discussed above, the trial court in the case at hand did not make findings of fact and conclusions of law. The record before us, however, demonstrates that the trial court heard negative points about both Robin and Russell. The trial court had before it testimony that Russell had moved six times since the temporary orders were entered, that he was living with a

14

woman with drug convictions, that his two daughters did not have their own room and often shared a room with the woman with drug convictions, that Russell had committed acts of domestic violence against Robin, that he smoked and lived with other smokers, and that he could not read well. The trial court heard testimony from Russell that Robin's house had dog feces throughout several rooms, that she did not cook for the children, and that she did not have the right car seats for the children. The trial court received conflicting testimony regarding whether one of the children was allergic to smoke and whether Robin abused alcohol. The trial court also heard Robin admit that Russell was a good father and that she had failed to mention her concerns about his shortcomings during her deposition. Yet, the trial court was in the best position to weigh all of the testimony at the final hearing, including Robin's "new" testimony, because the judge who heard the above evidence and signed the final decree had previously heard other motions argued by the parties and could weigh their credibility. *See In re De la Pena*, 999 S.W.2d 521, 526 (Tex. App.—El Paso 1999, no pet.) (stating that appellate court must give deference to trial court because it is in the best position to observe the demeanor of the witnesses and evaluate their credibility).

Giving great deference to the trial court's decision because it observed the witnesses and was able to assess intangibles not apparent in the written

15

record, we hold that the trial court did not abuse its discretion by appointing Robin as the joint managing conservator with the right to establish the children's primary residence. *See Swaab v. Swaab*, No. 14-06-00593-CV, 2008 WL 1838023, at *13 (Tex. App.—Houston [14th Dist.] Apr. 24, 2008, no pet. h.) (holding that trial court did not abuse its discretion by appointing mother as joint managing conservator with the exclusive right to establish the child's primary residence when evidence showed that mother worked long hours and father's house was messy); *Shoemake v. Shoemake*, No. 13-05-00421-CV, 2007 WL 1288815, at *6 (Tex. App.—Corpus Christi May 3, 2007, no pet.) (mem. op.) (upholding trial court's decision to give father the right to determine the children's primary residence even though record contained conflicting evidence that both mother and father could provide a stable, loving environment). We overrule Russell's first issue.

## V. PROPERTY DIVISION

In his second issue, Russell contends that the trial court abused its discretion by awarding Robin property that was not owned by the community estate. Specifically, Russell complains that several of the vehicles that Robin was awarded are not owned by the community estate and that the trial court abused its discretion by ordering him to pay Robin $24,677 to reimburse her for economic contributions she made to his separate property.

16

**A. Standard of Review**

We recognize the trial court has wide discretion in dividing the marital estate, and we presume that the trial court exercised its discretion properly. *Murff v. Murff*, 615 S.W.2d 696, 698–99 (Tex. 1981). In dividing the estate of the parties, the trial court shall order a division of the property "that the court deems just and right, having due regard for the rights of each party and any children of the marriage." Tex. Fam. Code Ann. §7.001(Vernon 2006). The trial judge may order an unequal division of marital property when a reasonable basis exists for doing so. *Massey v. Massey*, 807 S.W.2d 391, 398 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (citing *Murff*, 615 S.W.2d at 698–99). This court will correct the trial court's division of marital property only when an abuse of discretion has been shown. *Murff*, 615 S.W.2d at 698. It is the duty of this court to indulge every reasonable presumption in favor of the proper exercise of discretion by the trial court in dividing the community estate. *Id.*

The family code and the Texas constitution provide that, with a few exceptions, all property acquired during a marriage is presumed to be community property. Tex. Const. art. XVI, § 15 ; Tex. Fam. Code Ann. § 5.02 (Vernon 2006). Property possessed by either party during or on dissolution of

17

the marriage is presumed to be community property unless that presumption is rebutted by clear and convincing evidence. Tex. Fam. Code Ann. § 5.02.

**B.     No Evidence of Ownership of Vehicles**

In the first part of his second issue, Russell complains about the vehicles that the trial court awarded to Robin. The decree reflects that the trial court awarded Robin a 1995 one-ton pickup, a black Dodge, a 1970 Corvette, a 1970 Chevrolet brown pickup, a 2003 Chevrolet 1500 pickup, a blue boat with a trailer and motor, an aluminum boat with a trailer and motor, a black trailer (new), and a medium box trailer. Of these nine items, Russell contends that the parties owned only Robin's 2003 Chevy pickup.

The trial court had before it Robin's amended inventory and appraisement, listing numerous vehicles. On direct examination, Robin testified that she believed that the inventory reflected a complete list of the parties' assets and debts. On cross-examination, however, Russell's counsel questioned Robin about several of the items that she had included on her inventory:

> Q:     Mrs[.] Mize, you said the community owns a '92 red extended cab pickup; correct?
>
> A.     *No. Just that that's everything that we've had.*
>
> Q.     Okay. I just want to clarify it so the Judge understands what you're saying.
>
> . . . .

18

All right.  Okay.  One-ton pickup, isn't that-- doesn't that belong to your mother-in-law, Mr. Mize's mother?

A.    It's in her name, but it's Russell's pickup.

Q.    Okay.  So it's registered to her?

A.    Yes.

Q.    Okay.  No. 3 is a black Dodge pickup, and isn't it true that that's a disabled pickup that belongs to a former customer?

A.    It's a disabled pickup that Russell's dad, he purchased.

Q.    That Russell what?

A.    He said he purchased.

Q.    He said he purchased it?

A.    Yes.

. . . .

Q.    That '70 Corvette, that's been gone for two years; correct?

A.    No.

Q.    No.

      '70 brown Chevy pickup, that belongs to a customer being repaired; correct?

A.    I don't believe so.

Q.    Okay. Well, let me ask you this: Do you know if there is a title in either your name or Russell's name for any of these vehicles that you've listed here?

19

A.     No, because when you own it -- the makeover title-- and to my knowledge, he never got it running, or we would've switched over the Corvette.

Q.     *So would it be fair to say that these are all vehicles that you've seen at some time or another in the-- in or around your husband over the years?*

A.     *Yes.  We've worked on them.*  We bought things for them.

Q.     And do you know where these vehicles are currently located at all?

A.     Some of them, yes.

Q.     Okay.  *And do you know if any of them are registered to yourself or to your husband?*

A.     *No, I don't*. [Emphasis added.]

. . . .

Q.     Are you asking the Court to give you that trailer?

A.     Yes.

Q.     And do you have any idea who it is registered to?

A.     No.

Q.     Do you have any idea when it was purchased?

THE COURT:     Hold it.

Do you?

I mean, all these vehicles, where [are] the titles?

20

[Russell's attorney]: Oh, I do. It's registered to Shirley Mize.

THE COURT: Pardon?

[Russell's attorney]: It's registered to his mother.

THE COURT: Are there car titles to these vehicles?

[Russell's attorney]: There are no titles to anything. This [Robin's efforts to be awarded the property listed on her inventory] is just a "throw it at the wall and see what sticks."

Additionally, Russell specifically testified that the parties do not own the one-ton pickup, the black Dodge pickup, the 1970 Corvette, the 1970 brown Chevy pickup, or the medium box trailer.

As reflected above, the evidence of ownership presented to the trial court was sketchy. Although there is normally a presumption that property possessed by either party during or on dissolution of the marriage is presumed to be community property, that presumption appears to have no application in this case because there was no evidence that the vehicles were owned or acquired by the parties. Robin admitted that Russell had previously owned and operated an auto repair shop at which Robin had seen some of the vehicles that she had listed on her inventory. Robin admitted that the one-ton truck was registered to Russell's mother, that his dad had purchased the black Dodge, and that although she could identify the Corvette and the trailer in the pictures, she

21

did not know under whose name they were registered. One of the attorneys proffered that the trailer was registered to Russell's mother. And Russell testified that the parties do not own the one-ton pickup, the black Dodge pickup, the 1970 Corvette, the 1970 brown Chevy pickup, or the medium box trailer. Even affording the trial court wide discretion in making the property division as it sees fit, we cannot say that the trial court did not abuse its discretion in awarding vehicles to Robin that the community does not own. We therefore hold that the trial court abused its discretion by awarding Robin vehicles in the absence of evidence that the parties owned them. *See Panozzo v. Panozzo*, 904 S.W.2d 780, 786 (Tex. App.—Corpus Christi 1995, no writ) (holding that trial court abused its discretion in awarding wife eighty pieces of commercial equipment located at Euro-Mex because there was no evidence as to the ownership of the equipment, the equipment was not in the possession of either party at the time of dissolution, and the relationship of the parties to Euro-Mex was not clear from the record). *But see Lusk v. Gen. Motors Acceptance Corp.*, 395 S.W.2d 847, 849–50 (Tex. Civ. App.—Tyler 1965, no writ) (holding that wife's name on certificate of title would not, without further proof, be sufficient to overcome community property presumption when both husband and wife had testified that car belonged to them jointly). We sustain the first part of Russell's second issue.

22

## C.    Economic Contribution

In the second part of his second issue, Russell contends that the trial court abused its discretion by awarding Robin $24,677 with six percent interest against Russell "for the purpose of a just and right division of property" because such an award was not supported by the evidence.    Specifically, Russell contends that Robin failed to bring forth sufficient evidence for the factfinder to determine the enhancement value of his separate property.   Robin responds that her proposed property distribution "contained the information needed to compute the economic contribution formula and reimbursement."

Here, the trial court had before it Robin's proposed property distribution, claiming that she was owed $18,065 in equity on community property, $14,404 in reimbursement, and at least $37,714  in economic contribution claims.  The trial court also had before it testimony from Russell that he earned $1,900 a month from renting the properties and that the parties had resided at one of the properties during the marriage.  After hearing the above evidence, the trial court awarded Robin $24,677 "for the purpose of a just and right division of property" and did not break down the amount into economic contribution, reimbursement, or equity.  Without the benefit of findings of fact and conclusions of law, we have no way of knowing exactly what the trial court factored in when calculating the $24,677, but we presume the trial court

23

considered the appropriate offsetting community benefits, to the extent the evidence revealed such, and applied the appropriate formulas in arriving at its number. However, because we are remanding for a new trial on the property division because vehicles were awarded to Robin that were not proved to be part of the community estate, the trial court may or may not decide to adjust the $24,677 award to effectuate a just and right division of property. We are confident that the trial court will again apply the appropriate formulas and consider appropriate offsetting community benefits, to the extent the evidence reveals such, in arriving at the final amount, if any, that will create a just and right division of the property. *See generally Rusk v. Rusk*, 5 S.W.3d 299, 310 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (holding that on remand the trial court should consider offsetting community benefits—rent-free living in property, subsequent rental income from property, tax breaks, and depreciation—in determining award to wife on reimbursement claims). We therefore sustain the second part of Russell's second issue.

## VI. CONCLUSION

Having overruled Russell's first and third issues, we affirm the parties' divorce and the designation of Robin as the primary joint managing conservator, but having sustained Russell's second issue, we reverse and remand to the trial

24

court for a new trial on the property division. *See* Tex. R. App. P. 43.2(a), (d), 43.3, 44.1(b).

SUE WALKER
JUSTICE

PANEL: CAYCE, C.J.; DAUPHINOT and WALKER, JJ.

DELIVERED: February 5, 2009