COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-08-015-CV

 

 

SHELLEY DURRELL HAINES CRITZ                                         APPELLANT/

AND
ROGER ALLEN CRITZ                                         CROSS-APPELLANT

 

 

                                                   V.

 

ROGER
ALLEN CRITZ, JOSEPH                                              APPELLEES/

C.
CRITZ, AND SHARON A.                                          CROSS-APPELLEE

CRITZ AND SHELLEY DURRELL

HAINES CRITZ 

 

                                              ------------

 

           FROM THE 231ST
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

Appellant Shelley Durrell Haines Critz complains
of the trial court=s final decree of divorce
appointing appellees Joseph C. Critz and Sharon A. Critz as joint managing
conservators of Ryder Critz. 
We reverse and remand.








                                         I.    Background

Roger and Shelley Critz met while they were both
working at a nightclub in the early 1990s. 
In February 1998, Shelley gave birth to their only child, Ryder, and in
September of that year, Shelley and Roger married.

In February 2003, after an argument about Roger=s alleged
drug use, Roger moved out of their house. 
Shelley remained in the house with Ryder for another six months before
she learned that it was being foreclosed.

Both Shelley and Ryder eventually moved in with
Roger=s parents,
Joseph and Sharon Critz (the Grandparents). 
While Shelley and Ryder were living with the Grandparents, Shelley met
and began dating Chris Martinez.  In
January of 2004, she began staying with Chris and away from the Grandparents= house
on weekends.  In May 2004, Shelley became
pregnant with Chris=s child.

In June 2004, Shelley moved in with Chris and his
parents while Ryder continued to stay with his Grandparents.  During much of the remainder of 2004, Shelley
was hospitalized due to complications from her pregnancy.  She saw Ryder one day in September, two days
in October, no days in November, and three days in December.  She also kept in contact with him by
phone.  During Christmas, she drove to
the Grandparents= house to see Ryder but she
became sick on the return trip and miscarried.








On January 27, 2005, Roger filed an original
petition for divorce requesting that he be appointed primary joint managing
conservator of Ryder.  The same day, the
Grandparents filed a petition intervening into the divorce suit seeking primary
joint managing conservatorship on the grounds that Roger and Shelley had
voluntarily abandoned Ryder, and that appointing Roger or Shelley as a primary
conservator would significantly impair Ryder=s
physical health or emotional development.

Shelley filed answers to the petitions, along
with a counterpetition for divorce requesting that she be appointed sole
managing conservator, and contending that appointment of the Grandparents or
Roger as joint managing conservators would not be in Ryder=s best
interests.

On May 12, 2005, the trial court issued temporary
orders that gave the Grandparents primary custody of Ryder, and delineated
specific times when Shelley and Roger had rights to possession.

In November 2006, Todd Maslow, a caseworker for
Family Court Services, submitted a social study report recommending that Ryder
should continue to reside with the Grandparents, but that he should continue to
see Shelley as much as possible.








In March 2007, the Grandparents filed a Aparenting
plan@ for
Ryder, which intended to Aestablish guidelines,@ Astate
the importance of [Ryder=s] well being,@ and Aestablish
goals for emotional support, education, and discipline.@  The parenting plan described their intentions
for Ryder=s education (including plans
related to his ADHD),[1]
his after-school care, his medical needs (including a list of health care
providers he would use), and Roger=s and
Shelley=s
proposed roles.  The plan proposed that
they, Shelley, and Roger all be appointed as joint managing conservators, that
the Grandparents should establish his primary residence, and that Shelley and
Roger should have designated times of possession, including times during the
summer and on holidays.








The issues regarding Ryder=s
custody were tried before the trial court in March 2007.  After the parties rested and counsel made
closing arguments, on March 30, 2007, the trial court appointed the
Grandparents, Shelley, and Roger as joint managing conservators of Ryder, with
the Grandparents having primary possession and the authority to establish his
permanent residence.  The trial
court set particular dates and times for Shelley to have access to Ryder, but stated
that Roger would have such access only Aat such
times as is agreed upon@ between him and his
parents.  In October 2007, the trial
judge signed a final decree of divorce that incorporated these decisions.[2]

In November 2007, Shelley filed a motion for new
trial, asserting that the evidence presented at trial was legally and factually
insufficient to support the trial court=s
conservatorship decision, and she requested the court to issue findings of fact
and conclusions of law related to its decree.[3]  The Grandparents responded to the motion
for new trial and submitted proposed findings of fact and conclusions of law,
which the trial court adopted.  In the
court=s
findings of fact, the court found that the Grandparents Arebutted
the parental presumption@ and that it was in Ryder=s best
interest that the Grandparents, Shelley, and Roger be appointed joint managing
conservators.  This appeal and
cross-appeal followed.

                                     II.    Issues on Appeal








Shelley complains of the trial court=s order
appointing the Grandparents as joint managing conservators of Ryder.  She contends that the trial court erred in
failing to make specific findings of fact identifying the basis for its
conclusion that the parental presumption was rebutted by the Grandparents.  She further contends that the evidence is
legally and factually insufficient to prove that she relinquished control of
Ryder for more than one year and that she would significantly impair Ryder=s
physical or emotional well-being.  Roger
complains of the trial court=s
failure to specify his periods of possession and access.  

A.     Standard of Review

A trial court=s
decision regarding the conservatorship of a child is reviewed under an abuse of
discretion standard.[4]  To determine whether a trial court abused its
discretion, we must decide whether the trial court acted without reference to
any guiding rules or principles; in other words, we must decide whether the act
was arbitrary or unreasonable.[5]  Merely because a trial court may decide a
matter within its discretion in a different manner than an appellate court
would in a similar circumstance does not demonstrate that an abuse of
discretion has occurred.[6]








An abuse of discretion does not occur where the
trial court bases its decision on conflicting evidence.[7]  Furthermore, an abuse of discretion does not
occur as long as some evidence of substantive and probative character exists to
support the trial court=s decision.[8]

B.     The Parental Presumption

In her first issue, Shelley contends that the
trial court abused its discretion when it appointed the Grandparents as joint
managing conservators of Ryder without making specific findings related to the
parental presumption described by sections 153.131 and 153.373 of the family
code.[9]  Section 153.131 provides:








(a)     Subject to the prohibition in Section
153.004,[10]
unless the court finds that appointment of the parent or parents would not be
in the best interest of the child because the appointment would significantly
impair the child=s physical health or
emotional development, a parent shall be appointed sole managing conservator or
both parents shall be appointed as joint managing conservators of the child.

 

(b)    It is a rebuttable presumption that the
appointment of the parents of a child as joint managing conservators is in the
best interest of the child.  A finding of
a history of family violence involving the parents of a child removes the
presumption under this subsection.[11]

 

Section 153.373 states that 

[t]he presumption that a
parent should be appointed or retained as managing conservator of the child is
rebutted if the court finds that:

 

(1)    the parent has voluntarily relinquished
actual care, control, and possession of the child to a nonparent, licensed
child‑placing agency, or authorized agency for a period of one year or
more, a portion of which was within 90 days preceding the date of intervention
in or filing of the suit; and

 

(2)    the appointment of the nonparent or agency
as managing conservator is in the best interest of the child.[12]

 








Collectively, these statutes provide that it is
presumed that the appointment of Athe
parents of a child@ as joint managing conservators
is in the best interest of the child.[13]  To overcome this presumption, a court must
find that (1) appointment of the parents would significantly impair the child=s
physical health or emotional development, (2) the parents have exhibited a
history of family violence, or (3) the parents voluntarily relinquished care,
control, and possession of the child to a non-parent for a year or more.[14]  A trial court=s
conclusion that the parental presumption has been rebutted must be supported by
specific findings of fact identifying the factual basis for the finding, and
the failure to make such findings constitutes error.[15]

Shelley contends that the trial court was
required to specifically make one of these three findings to appoint the
Grandparents as joint managing conservators. 
Relying on a Texas Supreme Court opinion construing a former version of the
family code, the Grandparents assert that the presumption does not apply and,
therefore, no findings were required because Shelley and Roger were also made
joint managing conservators.

In Brook v. Brook,[16]
the supreme court construed former family code section 14.01, which provided,
in pertinent part, as follows:








(a)     In any suit affecting the parent-child
relationship, the court may appoint a sole managing conservator or may appoint
joint managing conservators.  A managing
conservator must be a suitable, competent adult, or a parent, or an authorized
agency.  If the court finds that the
parents are or will be separated, the court shall appoint at least one managing
conservator.

 

(b)    A parent shall be appointed sole managing
conservator or both parents shall be appointed as joint managing conservators
of the child unless:

 

(1)    the court finds that appointment of the
parent or parents would not be in the best interest of the child because the
appointment would significantly impair the child=s physical health or
emotional development.[17]

 

The supreme court held that section 14.01 authorized a trial court to
appoint a non-parent as a joint managing conservator without proof that
appointment of a parent or the parents would significantly impair the child=s health
or development, so long as the non-parent shares custody with a parent.[18]








Unlike current section 153.131, former section
14.01 contained no rebuttable presumption that appointment of both parents as
joint managing conservators is in the child=s best
interest.[19]  At the time Brook was decided, a trial
court was authorized to appoint parents as joint managing conservators only
upon finding that the appointment would be in the child=s best
interest.[20]  This is no longer the law.[21]








Under current section 153.131, it is now presumed
that the appointment of both parents as joint managing conservators is
in the child=s best interest.[22]  This substantive change in the parental
presumption law is not addressed by the dissent.  When Brook was decided, there was no
rebuttable presumption that both parents be appointed joint managing
conservators.  Thus, under former law, so
long as one parent was appointed a joint managing conservator, as was the case
in Brook, the parental presumption was satisfied.  Under section 153.131, however, a non-parent
may not be appointed a joint managing conservator without overcoming the
presumption as to both parents.[23]  The plain wording of the statute makes clear
that this presumption applies when a non-parent seeks managing conservatorship
in lieu of or in addition to both parents. 
There is no language in section 153.131 that indicates that the
presumption is inapplicable to the appointment of non-parents as joint managing
conservators when the trial court also appoints one or both parents.  Nor does Brook compel this
result.  








The dissent suggests that we have departed from
binding precedent of the supreme court and of this court.  We clearly have not.  Brook, and this court=s nearly
twenty-year-old decision following it,[24]
interpreted and applied a former statute that did not contain a parental
presumption requiring that both parents be appointed joint managing
conservators unless rebutted.  Because Brook
construed a repealed statute that is substantively different than the statute
at issue here, we are, of course, not bound under the doctrine of stare decisis
by the Brook court=s interpretation of the repealed
statute.[25]








The dissent takes the novel position that the
presumption does not apply to the appointment of the joint managing
conservators in this case, but that it does apply to which joint managing
conservator should determine the child=s
permanent residence.  As written by the
legislature, however, section 153.131 contains no language that indicates a
legislative intent that a parental presumption applies to the issue of primary
custody apart from the determination of joint managing
conservatorship.  The title to section
153.131 is APresumption That Parent to be
Appointed Managing Conservator.@[26]  Moreover, the statute expressly refers to a
presumption that a parent should be appointed Asole
managing conservator,@ or that both parents should be
appointed Ajoint managing conservators@_it makes no reference to
a separate presumption for determining which joint managing conservator chooses
the child=s permanent residence.[27]  To reach the result that the dissent
advocates, we would be required to legislate from the bench and convert the
managing conservator presumption into a Aprimary
custody@
presumption with no statutory authority for doing so.  We are not inclined to do this.[28]








We hold that the trial court correctly followed
express provisions of the family code by applying the parental presumption to
the appointment of the Grandparents as joint managing conservators in this
case.  Upon finding that the parental
presumption was rebutted, however, the trial court failed to make findings
specifically stating how the presumption was rebutted.[29]  The failure to make such findings is error.[30]  This error was waived, however, because
Shelley did not timely request additional findings of fact.[31]  Shelley=s first
issue is overruled.

C.     The Sufficiency of the
Evidence to Overcome the Parental Presumption

We now turn to Shelley=s
contention in her second issue that insufficient evidence was presented by the
Grandparents to rebut the presumption through either voluntary relinquishment
or significant impairment grounds.[32]

1.     Standards
of Review

In an abuse of discretion review, legal and
factual insufficiency are not independent grounds for asserting error, but are
merely relevant factors in assessing whether a trial court abused its
discretion.[33]  Thus, in applying the abuse of discretion
standard, an appellate court in a family law case must apply a two-prong
analysis: (1) whether the trial court had sufficient evidence upon which to
exercise its discretion; and (2) whether the trial court erred in applying its
discretion.[34]








We may sustain a legal sufficiency challenge only
when (1) the record discloses a complete absence of evidence of a vital fact,
(2) the court is barred by rules of law or of evidence from giving weight to
the only evidence offered to prove a vital fact, (3) the evidence offered to
prove a vital fact is no more than a mere scintilla, or (4) the evidence
establishes conclusively the opposite of a vital fact.[35]  In determining whether there is legally
sufficient evidence to support the finding under review, we must consider
evidence favorable to the finding if a reasonable factfinder could and
disregard evidence contrary to the finding unless a reasonable factfinder could
not.[36]








When reviewing an assertion that the evidence is
factually insufficient to support a finding, we set aside the finding only if,
after considering and weighing all of the evidence in the record pertinent to
that finding, we determine that the evidence supporting the finding is so weak,
or so contrary to the overwhelming weight of all the evidence, that the answer
should be set aside and a new trial ordered.[37]

2.     Voluntary
Relinquishment of Ryder for a Period of One Year or More

The Grandparents contend that Shelley=s sparse
contact with Ryder from January 2004 to January 2005 proves that she
voluntarily relinquished actual care, control, and possession of Ryder to
them.  We disagree.

Between January and April of 2004, Shelley
maintained her permanent residence with Ryder and saw him on a majority of
days.  While she was absent from Ryder on
several occasions during that time period, there is no evidence that she
intended to surrender the care of Ryder.

After Shelley moved out of the Grandparents=
residence in June 2004, the time she spent with Ryder decreased.[38]  But, the testimony of both Shelley and Sharon
shows that, although Shelley was often physically separated from Ryder in the
latter part of 2004, she did not intend to relinquish control of him.








Shelley testified that she had agreed with the
Grandparents that Ryder would stay with them long enough to complete his school
year, and that she would change Ryder=s school
and have him live with her the following year. 
Shelley stated that she talked with the Grandparents about this plan A[w]eekly
from the moment that [she] didn=t stay
at their house@ and that she was Amade to
believe@ that
the change was going to happen.  Sharon
testified that she was aware of these plans when Shelley moved out of her
house, and that she knew that Shelley=s
intention was to take Ryder back.  She
also admitted that even when Shelley moved away, she was Astill
involved in decisions regarding Ryder@ and,
most importantly, that Shelley Anever
actually, really relinquished . . . control completely.@

Thus, while Shelley may have been physically
apart from Ryder for a substantial part of 2004, there is no evidence that she
voluntarily relinquished actual care, custody, and control of him to the
Grandparents.[39]








3.     Significant
Impairment of Ryder's Physical Health or Emotional Development

 

Shelley also contends that the evidence is
legally and factually insufficient to establish that appointing her and Roger
as joint managing conservators would significantly impair Ryder=s
physical health or emotional development.[40]  Although there is some evidence to support a
finding of significant impairment, we agree with Shelley that the evidence is
factually insufficient to support such a finding.

Impairment must be proved by a preponderance of
the evidence indicating that some specific, identifiable behavior or conduct of
the parent, demonstrated by specific acts or omissions of the parent, will
probably cause that harm.[41]  This is a heavy burden that is not satisfied
by merely showing that the non-parent would be a better custodian of the child.[42]  AClose
calls@ should
be decided in favor of the parent.[43]








Evidence of past misconduct is not alone
sufficient to show present unfitness.[44]  AIf the
parent is presently a suitable person to have custody, the fact that there was
a time in the past when the parent would not have been a proper person to have
such custody is not controlling.@[45]

The evidence offered at trial was as follows:

Diane Booth, a licensed social worker who
conducted another study in 2006 after Maslow issued his report, testified that
Joseph and Sharon were Agreat grandparents@ and
that Shelley was a good mom who never put Ryder in any danger and was generally
doing a good job parenting him. 
She also reported that Roger had drug addiction problems, that he
described himself as a Apracticing alcoholic,@ and
that he seemed to be angry over the fact that he had been adopted, but that he
had steady work and that he Aloved
being around Ryder.@ 
She further explained that when she met with Ryder, he was happy, but he
was also confused about his living situation regarding the various people who
had requested custody of him.  She also
testified that she received a letter from Ryder stating that he wanted to live
with Shelley.








Booth recommended that Ryder be placed with
Shelley and opined that it would be in Ryder=s best
interest if the Grandparents fulfilled a secondary role in a more typical
grandparent relationship with Ryder.

Barbara Martinez, Chris=s
mother, testified that Shelley was a good mother who took good care of Ryder
when he was at her house.  According to
Mrs. Martinez, Shelley bathed Ryder, did his laundry, disciplined him, and
helped him with his homework.  Kyra
Anderson, Ryder=s first grade teacher during
2004 and 2005, testified that the Grandparents were very involved in his school
activities and in the progress Ryder was making in the classroom, that Ryder Afully
enjoyed being with@ them, and that Shelley was not
involved with his schooling.[46]








Dee Henderson, who had custody of Shelley=s
daughter Lexi, testified that she had concerns about Shelley=s
ability as a parent because Shelley was unreliable and had only limited contact
with Lexi.[47]  She also testified, however, that she had no
concerns that Lexi would be physically harmed while with Shelley, that she had
no concerns about Lexi=s safety at the Martinezes= house,
and that she had never seen Shelley be physically or verbally abusive to Lexi
or Ryder.

Cathy Baczynski, a licensed professional
counselor, testified that, during counseling, Roger discussed identity issues
related to his adoption as well as his substance abuse history, his need to
overcome his ADHD, his frustration about living with his parents, and his lack
of communication with Shelley.  Baczynski
also explained that she met with Ryder and gained the impression from him that
Roger needed to be much more involved in Ryder=s
life.  She also stated that Ryder seemed
to be happy living with his Grandparents and that his needs were well met in
their home, but that he would like to spend more time with Shelley and that, as
a general rule, it is always best for a child=s
parents to have custody if possible.  She
concluded that Roger has made positive strides, but he does not have the
ability to be Ryder=s primary managing conservator. 








Roger testified that he resided with his parents
for three years preceding the trial, that he was currently employed in the
information technology field, and that he had previously been employed as a
bartender at several locations.  He
stated that two years had passed from the last time he used illegal drugs and
that he drank alcohol about once a week at the time of trial, becoming drunk
occasionally.  He expressed a desire to
be a good father and also gave his opinion that Ryder should continue to reside
with the Grandparents because he felt Ryder needed more Astructure
and support,@ but that Shelley should have
equal time with Ryder and that she Aloves
[Ryder] very much.@ 
However, Roger also testified that in January 2005 Shelley threatened to
take Ryder away so that he and the Grandparents would never see Ryder again.[48]  He further said that when he first separated
from Shelley he was concerned for Ryder=s safety
because he believed Shelley did not take care of Ryder=s
physical needs.








Sharon testified that she and Joseph first began
to keep Ryder at their home every other weekend when he was born, and then they
progressed to keeping him every weekend and part of the summer before Shelley
and Ryder moved in with them in 2003. 
She also contended that Shelley was not very involved in Ryder=s early
education and that she often returned Ryder late from her Wednesday visits with
him.  Sharon explained that upon picking
up Ryder from one of his visits to the Martinezes= house,
she became concerned about broken glass surrounding a trampoline, a murky
swimming pool, and an open flame on the stove, which Shelley stated was used
for heating.  She was also concerned that
Shelley had taken Ryder to the nightclub during a poker tournament that was
hosted there.

Sharon said that she saw Shelley slap Ryder one
time, that Shelley told her that she spanks Ryder, and that after returning
from visits with Shelley, Ryder had behavioral problems.  She conceded, however, that Ryder missed
Shelley and that he and Shelley loved each other.  She requested that the court allow her and
Joseph to keep Ryder during school weeks and split the rest of Ryder=s access
equally between Roger and Shelley.

Joseph testified that he was concerned that
Shelley could not provide a stable financial environment for Ryder because she
did not have a paying job, did not have a car in her name, and did not have her
own place to live.  Joseph described
that Roger had taken a more active role in Ryder=s life,
had obtained a respectable job, had provided health insurance for Ryder, and
had sought help from a therapist to deal with Roger=s
emotional problems.








Todd Maslow (who submitted the original social
study report) testified that, despite his recommendation that Ryder should
remain with his Grandparents, he would not have concerns about Ryder=s safety
if he stayed with Shelley and did not believe that Ryder living with Shelley
would significantly impair Ryder=s
physical health or emotional development.[49]  He also testified that when he talked to
Ryder when completing his initial study, Ryder told him he wanted to live with
Shelley.








The Grandparents also rely on evidence of Shelley=s
history of drug use and her living and financial conditions as proof that Ryder=s
physical and emotional health would be impaired by the appointment of Shelley
and Roger as joint managing conservators. 
At the time of trial, however, Shelley was not taking any
medications.  While she admitted that she
had previously been dependent on drugs prescribed for her multiple sclerosis,[50]
and evidence established that she had taken high dosages of several types of
prescription medications that sometimes negatively affected her,[51]
she testified that at the time of trial, she was not taking any prescription
medications, she had no current symptoms from her multiple sclerosis, and she
only had one prescriptionCfor XanaxCfilled
within the previous six months.  No
evidence was presented indicating that Shelley was still taking high dosages of
prescription medications at the time of or recently before trial; in fact, a Aprescription
profile@ exhibit
submitted into evidence by the Grandparents listed no prescriptions for Shelley
after 2005.  Thus, while Shelley=s drug
use may have affected her fitness as a mother in the past, there was no
evidence presented of any current drug use that would cause significant
impairment to Ryder=s physical health or emotional
development in the present.








With regard to Shelley=s living
and financial conditions, the evidence shows that, at the time of trial,
Shelley and Chris, who also has a history of drug abuse, were living together
at his parents= home.  Chris, however, offered uncontroverted
testimony that he had not used illegal drugs in at least the four years
preceding trial.  Also, the evidence
established that at the Martinezes= five
bedroom, two story house, Ryder had his own room and that Shelley=s work
at the nightclub on weekends could allow her to be a stay-at-home mom for Ryder
during weekdays.[52]  Shelley=s
residence at the Martinezes= house
seemed to be stable.  Mrs. Martinez
testified that Shelley had become like a daughter to her and that if Chris=s and
her relationship became estranged, Shelley could continue to live at her house
with Ryder.  Although, as the
Grandparents point out, Shelley does not own or lease a vehicle, carry health
insurance, or maintain paid employment, Mrs. Martinez testified that Shelley
has access to four vehicles at her house and that she is Afree to
take them anytime,@ Roger carries insurance for
Ryder, and Shelley=s lack of paid employment is Ano
evidence@ of a
potential for significant impairment to Ryder.[53]








Finally, the Grandparents cite evidence in the
record related to certain conditions at the Martinezes= house
that they believe could cause harm to Ryder. 
For example, they note that the Martinezes=
backyard had a murky pool that was filled with leaves and a trampoline that had
broken glass underneath it.  Mrs.
Martinez, on the other hand, testified that Ryder was never allowed unattended
outside, that an alarm sounded if any door in the house was opened, and that if
the trial judge was concerned about the safety of the pool, she would remedy
those concerns.  Sharon testified that
she had learned that the broken glass was from a patio table that had blown
into the pool during a windstorm; there was no evidence in the record as to how
recently the windstorm had occurred. 
Sharon was also concerned at trial about an open flame used to heat the
Martinezes= house, but she admitted that
Ryder had been taught about fire hazards and that he was unlikely to attempt to
play with the flame.

Viewing the entire record under the legal and
factual sufficiency standards of review articulated above, we conclude that,
while there is some evidence that placing Ryder under the joint managing
conservatorship of Shelley and Roger might significantly impair the physical
health and emotional development of Ryder, the evidence is factually
insufficient to support a finding of such impairment.

                                          III.   Conclusion








We hold that the trial court abused its
discretion by appointing the Grandparents as joint managing conservators
because the evidence is insufficient to support the trial court=s
finding that the parental presumption was rebutted.  There is no evidence that Shelley voluntarily
relinquished actual care, custody, and control of Ryder for one year or more,
and the evidence is factually insufficient to prove that the appointment of
Ryder=s
parents as joint managing conservators would significantly impair Ryder=s
physical health or emotional development. 
We, therefore, reverse the provisions of the decree pertaining to joint
managing conservatorship, render judgment that a non-parent shall not be
appointed joint managing conservator based on Shelley=s
alleged voluntary relinquishment of Ryder=s care,
custody, and control for the period between January 2004 and January 2005, and
remand the case for a new trial on the issue of whether the appointment of
Shelley and Roger as joint managing conservators would not be in the best
interest of Ryder because such an appointment would significantly impair his
physical health or emotional development.[54]

 

JOHN
CAYCE

CHIEF
JUSTICE

 

PANEL:  CAYCE, C.J.; LIVINGSTON
and GARDNER, JJ.

LIVINGSTON, J. filed a dissenting and concurring opinion.

DELIVERED:  September 17, 2009











 
 
 
 
 
 
 




 

 

 

                                      COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

                                        NO.
2-08-015-CV

 

SHELLEY
DURRELL HAINES CRITZ                                         APPELLANT/

AND ROGER ALLEN CRITZ                                         CROSS-APPELLANT

                                                   V.

ROGER
ALLEN CRITZ, JOSEPH                                              APPELLEES/

C.
CRITZ, AND SHARON A.                                          CROSS-APPELLEE

CRITZ AND SHELLEY DURRELL


HAINES CRITZ 

 

                                              ------------

           FROM
THE 231ST DISTRICT COURT OF TARRANT COUNTY

                                              ------------

                   DISSENTING
AND CONCURRING OPINION

                                              ------------








The majority holds that the trial court could not
appoint Joseph and Sharon (the Grandparents) together with Shelley and Roger
(the Parents) as Ryder=s joint managing conservators
without applying the statutory parental presumption and determining that the
Parents voluntarily relinquished care, custody, or control of Ryder or that the
Parents=
appointment as managing conservators would significantly impair Ryder=s
physical health or emotional development. 
See Majority op. at 9B14.  The majority departs from Texas Supreme Court
precedent and our own precedent in its holding.

The Collective
Appointment of the Grandparents and the Parents as Ryder=s Joint Managing
Conservators

 

Shelley=s
argument in her second issue that the trial court abused its discretion when it
appointed the Grandparents as Ryder=s joint
managing conservators along with the Parents in that same role presupposes that
the Grandparents were required to overcome the statutory parental presumption
to gain the appointment.  That
supposition (and the majority=s
holding that follows the supposition) is erroneous.








Sections 153.131 and 153.373 of the family code
establish that to overcome the presumption that a parent must be appointed as a
managing conservator of a child, a court must find that (1) appointment of the
parent would significantly impair the child=s
physical health or emotional development, (2) the parent has exhibited a
history of family violence, or (3) the parent voluntarily relinquished care,
control, and possession of the child to a nonparent for a year or more.  Tex. Fam. Code Ann. ''
153.131, .373 (Vernon 2008); see In re N.J.G., 980 S.W.2d 764, 766 n.1
(Tex. App.CSan Antonio 1998, no pet.)
(citing sections 153.131 and 153.373 in a discussion of the parental
presumption).  But these findings are not
required when both parents are named managing conservators.

Section 153.372 authorizes a trial court to
appoint parents and nonparents together as joint managing conservators.  Tex. Fam. Code Ann. ' 153.372(a)
(Vernon 2008).  And Texas Supreme Court
precedent holds that the mere appointment of grandparents as joint managing
conservators alongside parents in that same role does not require a trial court
to apply the parental presumption to exclude the grandparents; rather, the
trial court may make such an appointment if it deems the appointment to be in
the best interest of the child.  Brook
v. Brook, 881 S.W.2d 297, 299B300
(Tex. 1994).








In Brook, the court reviewed the
collective appointment of the mother and the mother=s
parents as joint managing conservators to the exclusion of the father and
unanimously reasoned that the statutory parental presumption Acontemplates
a situation in which neither of the parents are awarded@
managing conservatorship.  Id. at
298B99.  The court explained that the parental
presumption applies Aonly to those situations in
which a nonparent seeks custody in lieu of a natural parent.@  Id. at 299 (emphasis added).  Finally, the court noted that A[t]he
purpose of the statute, to codify the preference for giving custody to a
parent, has been met in the present case. 
The fact that a nonparent shares custody does not detract from the fact
that one of the child=s parents does have custody.@  Id. at 300.  We have expressly held the same.  Connors v. Connors, 796 S.W.2d 233,
239 (Tex. App.CFort Worth 1990, writ denied)
(holding that the presumption Adoes not
preclude the appointment of a parent to serve jointly with a non‑parent@ and
that it applies  only if Aappointment
is to be denied to both parents@).








While Brook cited a previous version of
the family code, the language analyzed in the decision is almost exactly the
same as the language that now appears in subsection (a) of section 153.131.[1]  Brook,
881 S.W.2d at 298B99.  The only addition to the presumption statute
that amounts to anything beyond rearranging words is subsection (b) of section
153.131, which states that it is Aa
rebuttable presumption that the appointment of the parents of a child as joint
managing conservators is in the best interest of the child.@








The majority solely relies on subsection (b) as
having precedent-overruling importance.  See
Majority op. at 10B13.  But while it is possible (although not
supported by any specific authority or legislative history in the majority=s
opinion beyond the statutory amendment itself) that subsection (b) could have
modified Brook to the extent that the presumption applies unless both
parents (rather than a single parent, like in Brook) are named joint
managing conservators, that possible modification would have no effect on Brook=s
relation to this case because here the trial court did name both of the
Parents as joint managing conservators, and thus completely complied with
subsection (b).  Thus, for section
153.131(b) to achieve the precedent-altering result that the majority holds it
does under the facts of this case, it would need to go beyond stating that A[i]t is
a rebuttable presumption that the appointment of the parents of a child as
joint managing conservators is in the best interest of the child@ to say
something similar to Ait is a rebuttable presumption
that the appointment of parents of a child as joint managing conservators to
the exclusion of all other parties seeking custody is in the best interest
of the child.@ 
It does not do so.[2]








It is Afundamental
to the very structure of our appellate system that [the Texas Supreme Court=s]
decisions be binding on the lower courts.@  Dallas Area Rapid Transit v. Amalgamated
Transit Union Local No. 1338, 273 S.W.3d 659, 666 (Tex. 2008), cert.
denied, 129 S. Ct. 2767 (2009); see Lubbock County v. Trammel=s
Lubbock Bail Bonds, 80 S.W.3d 580, 585 (Tex. 2002) (explaining that
it Ais not
the function of a court of appeals to abrogate or modify established precedent@).  Under the established precedent of the
supreme court in Brook and of our own court in Connors, the
Grandparents did not have to overcome the parental presumption for their
appointment as joint managing conservators, and I would hold that their
appointment as such is in Ryder=s best
interest under the factors listed in Holley v. Adams.  544 S.W.2d 367, 372 (Tex. 1976).  Thus, I would affirm the trial court=s
conservatorship appointment, and I dissent to the portion of the majority=s
opinion reversing the appointment.

Primary Possession

Although Brook=s
application supports affirming the Grandparents=
appointment as managing conservators along with the Parents, it does not extend
to their award of Ryder=s primary possession, as
challenged by Shelley.  Section
153.134(b)(1) of the family code states that in rendering an order appointing
joint managing conservators, a court shall designate which conservator has the
exclusive right to determine the primary residence of the child.  Tex. Fam. Code Ann. '
153.134(b)(1) (Vernon 2008).








In Sotelo v. Gonzales, the El Paso Court
of Appeals decided that in an original custody determination, the parental
presumption Aapplies when a non‑parent
and parent are appointed joint managing conservators of a child but the non‑parent
is given primary custody.@ 
170 S.W.3d 783, 788 (Tex. App.CEl Paso
2005, no pet.) (citing In re De La Pena, 999 S.W.2d 521, 534B35 (Tex.
App.CEl Paso
1999, no pet.)).  The court reasoned that
to Ahold
otherwise would permit the court to apply the presumption in appointing the
parent a joint managing conservator but nevertheless choose the primary
residence of the child on the basis of a heads‑up best interest test,
with the court determining which of the parties is the >better= choice.@  Id. 
This would, according to the El Paso Court, result in the Aappointment
of a parent as a managing conservator in name only, a paper title which
eviscerates the purpose of the statute.@  De La Pena, 999 S.W.2d at 535.

In contrast, the San Antonio Court of Appeals
held in Gardner v. Gardner that the parental presumption does not apply
to the issue of primary possession between parent and nonparent joint managing
conservators.  229 S.W.3d 747, 752 (Tex.
App.CSan
Antonio 2007, no pet.).  In Gardner,
the parties agreed to joint managing conservatorship of the children at issue,
and the only remaining custody issue was which joint managing conservator was
going to be awarded the right to determine the primary residence.  Id. 
The court reasoned that because the Aplain
words of [section 153.131] do not address or contemplate application of the
[parental] presumption to the issue of primary possession, [it] would have to
rewrite the statute in order to reach the result in De La Pena.@  Id.








I agree with and would adopt the El Paso Court=s
position, applying the same reasoning as expressed in Sotelo and De
La Pena.  In De La Pena, the
child=s aunt
sought managing conservatorship to the exclusion of both parents in that
same role.  De La Pena, 999
S.W.2d at 524B25.  Because she sought complete exclusion of the
parents, the El Paso Court properly applied the statutory presumption (as
interpreted by Brook) that Athe best
interest of a child is served if a natural parent is appointed as a managing
conservator.@ 
Id. at 527.  Then, in
applying the presumption to the primary possession issue, the El Paso Court
held and explained that

as between a parent and
nonparent, unless the court finds that appointment of the parent would not be
in the best interest of the child because it would significantly impair the
child=s physical health or
emotional development, the parent shall be appointed sole managing conservator or
the parent and nonparent shall be appointed joint managing conservators.  If the 
court chooses the latter, the parent shall be awarded primary possession
unless such an order would not be in the best interest of the child because it
would significantly impair the child=s physical health or emotional development.[3]

 

Id. at 534B35 (emphasis added).

 








Our precedent establishes that the basis of the Adeeply
embedded@
statutory parental presumption is to protect the Anatural
affection usually flowing between parent and child.@  In re M.N.G., 113 S.W.3d 27, 35 (Tex.
App.CFort
Worth 2003, no pet.).  Also, a parent=s rights
to Athe
companionship, care, custody, and management@ of his
or her children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745,
758B59, 102
S. Ct. 1388, 1397 (1982).  Implicit in
these rights is the right to decide where one=s child
is to reside.

The majority says that applying the parental
presumption to which joint managing conservator has the right to determine a
child=s
primary residence would require us to Alegislate
from the bench.@[4] 
Majority op. at 14.  But the
family code supports the application of the presumption even when nonparents
are designated as joint managing conservators without applying the presumption
under circumstances like those in Brook. 
As the El Paso Court explained, ASection
153.372(b) [of the family code] provides that the procedural and substantive
standards regarding a court‑ordered joint managing conservatorship
provided by Subchapter C of the Family Code apply to a nonparent joint managing
conservator. The very first section of Subchapter C contains the parental
presumption.@ 
De La Pena, 999 S.W.2d at 534; see Tex. Fam. Code Ann. ' 153.372(b)
(Vernon 2008).








Other sections of the family code also support
presuming that parents should maintain the right to designate a child=s
primary residence, which, as our supreme court has explained, is a crucial
component of managing conservatorship.  See
Phillips v. Beaber, 995 S.W.2d 655, 660B61 (Tex.
1999) (equating the right of primary possession with Acustody@ and
adding that primary possession and establishing a child=s
residence are Acore rights of managing
conservatorship@); see also Troxel v.
Granville, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000) (explaining that Athe
interest of parents in the care, custody, and control of their children . . .
is perhaps the oldest of the fundamental liberty interests@).  For instance, the very first section of the
conservatorship chapter of the family code relates that the state=s public
policy is to Aassure that children will have
frequent and continuing contact with parents.@  Tex. Fam. Code Ann. ' 153.001(a)(1)
(Vernon 2008).  Another section of the
code states that A[i]t is the policy of this state
to . . . optimize the development of a close and continuing relationship
between each parent and child.@  Id. '
153.251(b) (Vernon 2008).








I would hold that erasing the parental
presumption in an original suit on custody when a court appoints multiple
parties as managing conservators but gives primary possession to a nonparent
would weaken these constitutional and statutory interests and would create an
unintended result by placing the parent and nonparent on equal ground for the
trial court=s real custody
determination.  Thus, because I agree
with the majority that the evidence in this case is insufficient to support the
trial court=s finding that the Grandparents
rebutted the parental presumption, I would reverse the provisions of the trial
court=s order
pertaining to the Grandparents= right
to determine Ryder=s primary residence and remand
this case for further proceedings related to those provisions.  I would also sustain Roger=s sole
issue and reverse the portion of the order limiting Roger=s access
to and possession of Ryder because as all parties have agreed, there is no
evidence in the record supporting that limitation.

                                             Conclusion

For these reasons, I respectfully dissent to the
portion of the majority=s opinion and judgment reversing
the trial court=s appointment of the
Grandparents and Parents together as Ryder=s joint
managing conservators, but I concur with the majority=s remand
of the case for further proceedings.

 

TERRIE
LIVINGSTON

JUSTICE

 

DELIVERED: September 17, 2009











[1]Ryder was diagnosed with
ADHD while in the second grade.





[2]Specifically, the decree
granted Shelley possession of Ryder on three weekends per month, Thursday
evenings, spring breaks, some of the time during Ryder=s Christmas break, Mother=s Day, some other
holidays, and forty- two days during the summer, but gave possession to the
Grandparents at Aall other times not
specifically designated.@ 





[3]See Tex. R. Civ. P. 296.





[4]See In re M.P.B., 257 S.W.3d 804, 811
(Tex. App.CDallas 2008, no pet.); Earvin
v. Dep=t of Family &
Protective Servs., 229 S.W.3d 345, 350 (Tex. App.CHouston [1st Dist.] 2007, no pet.). 





[5]Downer v. Aquamarine
Operators, Inc., 701 S.W.2d 238, 241B42 (Tex. 1985), cert. denied, 476 U.S.
1159 (1986).





[6]Id.





[7]In re Barber, 982 S.W.2d 364, 366
(Tex. 1998) (orig. proceeding).





[8]See Butnaru v. Ford Motor
Co., 84
S.W.3d 198, 211 (Tex. 2002).





[9]Tex. Fam. Code Ann. '' 153.131, .373
(Vernon 2008). 





[10]Section 153.004 states,
in part, that in determining conservatorship, a court shall consider evidence
of the intentional use of abusive physical force and that a court may not Aappoint joint managing
conservators if credible evidence is presented of a history or pattern of past
or present child neglect, or physical or sexual abuse by one parent directed
against the other parent, a spouse, or a child . . . that results in the other
parent becoming pregnant with the child.@  Tex. Fam.
Code Ann. ' 153.004(a)B(b) (Vernon 2008); see
In re R.T.H., 175 S.W.3d 519, 521 (Tex. App.CFort Worth 2005, no
pet.).





[11]Tex. Fam. Code Ann. ' 153.131.





[12]Id. ' 153.373. 





[13]Id. '' 153.131(a),(b),
.373.





[14]Id. '' 153.131(a),(b),
.373; see In re N.J.G., 980 S.W.2d 764, 766 n.1 (Tex. App.CSan Antonio 1998, no
pet.).





[15]Chavez v. Chavez, 148 S.W.3d 449, 459B60 (Tex. App.CEl Paso 2004, no pet.); see
Tex. Fam. Code Ann. '' 153.004, .131, .373.





[16]881 S.W.2d 297 (Tex.
1994).





[17]Act of May 29, 1993, 73rd
Leg., R.S., ch. 766, ' 1, sec. 14.01(a), 1993
Tex. Gen. Laws 2989, 2989, repealed by Act of April 6, 1995, 74th Leg.,
R.S., ch. 20, ' 2, 1995 Tex. Gen. Laws
282, 282; Act of May 28, 1989, 71st Leg., R.S., ch. 370, ' 1, sec. 14.01(b)(1),
1989 Tex. Gen. Laws 1461, 1461, repealed by Act of April 6, 1995, 74th
Leg., R.S., ch. 20, ' 2, 1995 Tex. Gen. Laws
282, 282.





[18]Brook, 881 S.W.2d at 300.





[19]See Tex. Fam. Code Ann. ' 153.131(b), Historical
and Statutory Notes (AActs 1995, 74th Leg., ch.
751 . . . added subsec. (b),@ which provides for Arebuttable presumption
that the appointment of the parents of a child as joint managing conservators
is in the best interest of the child@).





[20]See Act of May 14, 1991,
72nd Leg., R.S., ch. 161, ' 2, 1991 Tex. Gen. Laws 771, 771, repealed by Act
of April 6, 1995, 74th Leg., R.S., ch. 20, ' 2, 1995 Tex. Gen. Laws 282, 282; see
also Brook, 881 S.W.2d at 298.





[21]While we have found no
legislative history beyond the changes made to the current statute after
section 14.01 was repealed that expressly indicates that the legislature
intended to overrule or nullify Brook when it repealed section 14.01, it
is clear from a comparison of the two statutes that the post-Brook
changes to the statutes were substantive.





[22]See Tex. Fam. Code Ann. ' 153.131(a) (Aboth parents shall be appointed as
joint managing conservators of the child@) (emphasis added), ' 153.131(b) (AIt is a rebuttable
presumption that the appointment of the parents of a child as
joint managing conservators is in the best interest of the child.@) (emphasis added).





[23]See Tex. Fam. Code Ann. ' 153.131(a) (Aboth parents shall be appointed as
joint managing conservators of the child@) (emphasis added), ' 153.131(b) (AIt is a rebuttable
presumption that the appointment of the parents of a child as
joint managing conservators is in the best interest of the child.@) (emphasis added).  The dissent contends that the presumption
does not apply to the grandparents because both parents were appointed as joint
managing conservators.  But section
153.131 clearly requires that the presumption favoring the appointment of both
parents as joint managing conservators be rebutted by any non-parent seeking a
joint managing conservatorship appointment in lieu of or in addition to both
parents.





[24]See Connors v. Connors, 796 S.W.2d 233, 239
(Tex. App._Fort Worth 1990, writ
denied).





[25]See Lal v. Harris
Methodist Fort Worth, 230 S.W.3d 468, 473B74 (Tex. App.CFort Worth 2007, no pet.) (rejecting argument
that statute that was substantively amended should be construed as if it had
not been amended). 





[26]Tex. Fam. Code Ann. ' 153.131 (emphasis
added).





[27]Id.





[28]Moreover, the two El Paso
Court of Appeals opinions on which the dissent relies actually support the
conclusion that the parental presumption only applies to primary custody in the
context of determining joint managing conservatorship between a parent and
non-parent.  See Sotelo v. Gonzales,
170 S.W.3d 783, 788 (Tex. App._El Paso 2005, no pet.); In
re De La Pena, 999 S.W.2d 521, 534_35 (Tex. App._El Paso 1999, no pet.).





[29]The trial court also
offered no explanation for why he appointed Shelley and Roger joint managing
conservators of Ryder after concluding that the presumption was rebutted, i.e.,
that it would not be in Ryder=s best interest to appoint his parents as joint
managing conservators.





[30]Chavez, 148 S.W.3d at 459B60.





[31]Tex. R. Civ. P. 297, 299;
Chavez, 148 S.W.3d at 459B60.





[32]Joseph and Sharon have
not contended on appeal that the evidence supported a finding that Shelley
exhibited a history of family violence, so we will not analyze this ground for
rebutting the parental presumption.  See
Tex. Fam. Code Ann. ' 153.131(b).





[33]M.P.B., 257 S.W.3d at 811B12; In re M.C.F.,
121 S.W.3d 891, 895, 899 (Tex. App.CFort Worth 2003, no pet.).





[34]M.C.F., 121 S.W.3d at 895.





[35]Uniroyal Goodrich Tire
Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S. 1040
(1999); Robert W. Calvert, "No Evidence" and "Insufficient
Evidence" Points of Error, 38 Tex. L. Rev. 361, 362B63 (1960).





[36]Cent. Ready Mix Concrete
Co. v. Islas,
228 S.W.3d 649, 651 (Tex. 2007); City of Keller v. Wilson, 168 S.W.3d
802, 807, 827 (Tex. 2005).





[37]Pool v. Ford Motor Co., 715 S.W.2d 629, 635
(Tex. 1986) (op. on reh=g); Garza v. Alviar,
395 S.W.2d 821, 823 (Tex. 1965); In re King=s Estate, 150 Tex. 662, 664_65, 244 S.W.2d 660, 661 (1951).





[38]According to Sharon=s calendar, Shelley saw
Ryder only twenty times from June through December 2004.





[39]Even if we were to
conclude that some evidence of relinquishment existed beginning in June 2004,
when Shelley moved out of the Grandparents= home, she filed answers to Roger=s petition and the
Grandparent=s petition in
intervention in February 2005 and, therefore, ended any period of voluntary
relinquishment approximately seven months after leaving the Grandparents= house to leave Ryder
with his grandparents.  See In re
S.W.H., 72 S.W.3d 772, 777 (Tex. App._Fort Worth 2002, no
pet.).  Moreover, in May 2005, the trial
court entered a temporary order restricting Shelley=s access to Ryder.  In light of such an order, any relinquishment
by Shelley that occurred while the order was in effect was involuntary.  Id. (concluding that a temporary
restraining order entered against a parent ended the parent=s period of voluntary
relinquishment); see also In re M.W., 959 S.W.2d 661, 668 (Tex. App.CTyler 1997, writ denied)
(suggesting that voluntary relinquishment ends when temporary restrictions are
ordered).





[40]See Tex. Fam. Code Ann. ' 153.131(a); Sotelo,
170 S.W.3d at 788.





[41]Lewelling v. Lewelling, 796 S.W.2d 164, 167
(Tex. 1990); Whitworth v. Whitworth, 222 S.W.3d 616, 623 (Tex. App.CHouston [1st Dist.] 2007,
no pet.) (stating that the Alink between the parent=s conduct and harm to the
child may not be based on evidence which merely raises a surmise or speculation@); see Tex. Fam.
Code Ann. ' 105.005 (Vernon 2008)
(stating that findings in family law cases must generally be proved by the
preponderance standard).





[42]Lewelling, 796 S.W.2d at 167.





[43]Id. at 168.





[44]Id.





[45]May v. May, 829 S.W.2d 373, 377
(Tex. App.CCorpus Christi 1992, writ
denied) (op. on reh=g); see S.W.H., 72
S.W.3d at 777B78 (holding that the
mother=s past severe drug
addiction and past incarcerations related to drug use did not create a present
likelihood of significant impairment to her child).





[46]At trial, Shelley
testified that she visited Ryder=s school two days a week and that she went to his
school‑related activities.





[47]Shelley has had six
pregnancies.  Among these, she had a
daughter in 1994 named Lexi whom she lived with for only six months and shared
access to at the time of trial, and she also had a baby with Chris after her
miscarriage, who was six months old when the trial began.





[48]Sharon=s testimony confirmed the
threat.





[49]Specifically, Maslow
stated that the move to live with Shelley Acould affect [Ryder=s] emotional adjustment;
but seriously impair, no.@  He did, however, testify that he believed the
Grandparents and Roger were providing Ryder with security in his current
placement, that Ryder should remain with them, and that he retained some
concerns about some of Shelley=s circumstances and her truthfulness on some of
the responses she gave to him in his initial survey.





[50]Shelley had taken many
prescription medications, including Suboxone, Seroquel, Hydrocodone, Ambien,
Lunesta, Lamictal, and Xanax at various times before trial.  These medications sometimes made her dizzy or
drowsy with slurred speech.  Sharon
testified that in 2003, Shelley often left medication out in places that Ryder
had access to, and that in 2005, during one of Shelley=s scheduled visits with
Ryder, the medication caused Shelley to sleep for a prolonged period on Ryder=s bedroom floor.





[51]A pharmacist called by
Roger=s attorney described the
medications Shelley had taken and opined that the dosages were high, but
admitted that she had limited knowledge of multiple sclerosis and the reasons
why Shelley=s doctors may have been
prescribing the types and amounts of medication she was taking.





[52]Shelley helped manage a
nightclub that she, Chris, and Chris=s parents jointly owned, although she received
room and board in lieu of salary.  Chris=s mother watched Ryder
when Shelley worked.





[53]See Lewelling, 796 S.W.2d at 167.





[54]Because we have reversed
and remanded the issues related to conservatorship and possession, we need not
address Roger=s sole issue in which he
contends that the trial court abused its discretion by rendering a custody
order that, although naming him a joint managing conservator of Ryder, did not
designate his periods of possession and access. 
See Tex. R. App. P. 47.1.





[1]Subsection (a) of section 153.131
currently provides, 

 

[U]nless the court finds
that appointment of the parent or parents would not be in the best interest of
the child because the appointment would significantly impair the child=s physical health or
emotional development, a parent shall be appointed sole managing conservator or
both parents shall be appointed as joint managing conservators of the child.

 

Tex. Fam. Code Ann. ' 153.131(a).  At the time of the Brook decision, the
former section of the family code relating to the presumption stated,

 

A parent shall be
appointed sole managing conservator or both parents shall be appointed as joint
managing conservators of the child unless:

 

1) the court finds that
appointment of the parent or parents would not be in the best interest of the
child because the appointment would significantly impair the child=s physical health or
emotional development.

 

Act of May 28, 1989, 71st
Leg., R.S., ch. 370, ' 1, sec. 14.01(b)(1),
1989 Tex. Gen. Laws 1461, 1461, repealed by Act of April 6, 1995, 74th
Leg., R.S., ch. 20, ' 2, 1995 Tex. Gen. Laws
282, 282; see Brook, 881 S.W.2d at 298. 
In essence, the legislature amended the family code to switch the order
of the words existing in both provisions; it moved the words Athe court finds that
appointment of the parent or parents would not be in the best interest of the
child because the appointment would significantly impair the child=s physical health or
emotional development@ from behind to in front
of the words A[a] parent shall be
appointed sole managing conservator or both parents shall be appointed as joint
managing conservators of the child.@





[2]The majority states, AThere is no language in
section 153.131 that indicates that the presumption is inapplicable to the
appointment of non-parents as joint managing conservators when the trial court
also appoints one or both parents.@  Majority
op. at 12.  But there was likewise no
such language in the version of the statute analyzed in Brook.  Brook, 881 S.W.2d at 298B99.  The majority also argues that the Brook
and Connors opinions regarded Aa former statute that did not contain a parental
presumption requiring that both parents be appointed joint managing
conservators unless rebutted.@  Majority
op. at 12B13.  But again, that change to the former statute
is irrelevant to this case because the trial court did appoint both Parents
as joint managing conservators.





[3]This language signals the El Paso Court=s opinion that where a
court does not find significant impairment under the parental
presumption, appointment of parents alongside nonparents as joint managing
conservators is still proper because in such a situation, the parents have not
been excluded from managing conservatorship. 
Id.; see Brook, 881 S.W.2d at 299B300.





[4]The majority uses the Alegislate from the bench@ pejorative phrase in an
attempt to show why it would not apply the parental presumption to the right to
determine Ryder=s primary residence, but
it does not explain why that same phrase would not apply to its own expansive
interpretation of section 153.131 when that section applies to the appointment
of both parents as a child=s managing conservators.